Carol **CHESEMORE,** Daniel **Donkle,** Thomas **Gieck,** Martin **Robbins** and Nannette **Stoflet,** on behalf of themselves, individually, and on behalf of all others similarly situated, Plaintiffs,

v.

**ALLIANCE HOLDINGS, INC., A.H.I., Inc., David B. Fenkell, Pamela Klute, James Mastrangelo, Jeffrey A. Seefeldt, Alpha Investment Consulting Group, LLC and John Michael Maier,** Defendants,

and

**Trachte Building Systems, Inc. Employee Stock Ownership Plan and Alliance Holdings, Inc. Employee Stock Ownership Plan, Nominal Defendants.**

No. 09–cv–413–wmc.

United States District Court, W.D. Wisconsin.

July 24, 2012.

Andrew W. Erlandson, Marie A. Stanton, Coad Law Office, Madison, WI, Karen L. Handorf, Michelle Yau, Monya Monique Bunch, Robert Joseph Barton, Bruce Frank Rinaldi, Robyn Michelle Swanson, Cohen Milstein Sellers & Toll PLLC, Washington, DC, for Plaintiffs.

Angela M. Rust, Lora L. Zimmer, Patrick F. Koenen, Appleton, WI, Christopher Craig Woods, Kristen Marie Blankley, Columbus, OH, Jeffrey J. Wedel, Ryan A. Sobel, Cleveland, OH, Karen L. Handorf, Robert Joseph Barton, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Charles B. Wolf, Patrick Williamson Spangler, Benjamin Hartsock, Vedder Price P.C., Chicago, IL, Lynn Marie Stathas, Reinhart Boerner Van Deuren S.C., Madison, WI, for Defendants.

## OPINION AND ORDER

WILLIAM M. CONLEY, District Judge.

Once the concept of employee stock ownership plans (ESOPs) gained acceptance in the early 1970s, their numbers grew rapidly. *See Steven F. Freedman, Effects of ESOP Adoption and Employee Ownership: Thirty years of Research and Experience,* 2007 University of Pennsylvania Dynamics Working Papers, # 07–01 (January 10, 2007), posted at http:// repository.upenn.edu/od_working_papers/ 2. By 1993, more than 9,000 plans were in effect, along with over 20 pieces of legislation encouraging owners of privately-held companies to implement ESOPs and share equity with employees. *Id.* at 3. Since 1993, the number of ESOP plans appears to have stagnated, likely due to a combination of changes in the tax laws, the highly-publicized failures of ESOPs with ownership interests in corporations such as Enron, Polaroid and United Airlines, and the perceived costs of doing business associated with ESOPs, such as underinvestment, inefficient decisionmaking and conflicting fiduciary obligations. *Id.*

As many majority owners of closely-held companies with ESOPs began looking for ways to sell their majority interests, defendants David B. Fenkell and the companies he formed and controls, Alliance Holdings, Inc. ("Alliance"), A.H.I., Inc. ("AHI") and AH Transitions (collectively "the Alliance Defendants"), saw an opportunity. They buy companies with an ESOP, fold these ESOPs into the Alliance ESOP, hold and expand the companies over a relatively short period of time and then flip them at a profit, benefitting Alliance generally and Fenkell in particular as he personally redeems phantom stock. All of this is perfectly legal, provided that someone is acting as fiduciary to protect the interests of the employee holdings in the ESOP. Unfortunately, Fenkell and the other Alliance Defendants took calculated steps to insure no one would be doing so when they flipped Trachte Building Systems, Inc. ("Trachte").

In 2002, defendant Alliance purchased Trachte in a private stock transaction for $24 million and merged accounts of plaintiffs, who were Trachte employees, with an old Trachte ESOP into the Alliance Holdings, Inc. Employee Stock Ownership Plan and Trust (the "Alliance ESOP"). Five

years later, Alliance expected to sell Trachte for around $50 million. After failing to find a third-party buyer at the desired price, Alliance orchestrated a sale of Trachte to a newly-formed Trachte Building Systems Employee Stock Ownership Plan ("the Trachte ESOP"). Plaintiffs' accounts in the Alliance ESOP, holding approximately $8 million worth of Alliance stock, was a linchpin of the sale.

Alliance structured the sale as a series of interdependent actions on August 29, 2007 (collectively, "the 2007 Transaction"), each of which was conditioned on the completion of all subsequent actions. At Alliance's direction, the Alliance ESOP spun-off the Trachte employees' accounts into the new Trachte ESOP and the Alliance shares in those accounts were exchanged for Trachte shares held by AHI. Using these shares as collateral for loans, Trachte and the Trachte ESOP redeemed or purchased all of Trachte's outstanding equity from Alliance, AHI and Stephen Pagelow, Trachte's former CEO. At the close of the 2007 Transaction, the Trachte ESOP had paid $38.1 million for 100% of Trachte's equity and Trachte had taken on $36 million in debt. Fenkell and Alliance *designed* this transaction so that either plaintiffs' ESOP holdings would be used as leverage to buy Trachte on terms favorable to Alliance or those holdings would revert to holdings in the Alliance ESOP.

All of this might have been fine, except that Alliance also orchestrated the parties so that no independent person was looking out for the employees' interests in the Alliance or the Trachte ESOP. Only a week before the 2007 Transaction, Alliance appointed Trachte's President Jeffrey A. Seefeldt and CFO James Mastrangelo—both beholden to Alliance—as the sole members of Trachte's board of directors. The board then adopted a new Trachte ESOP and named as its sole trustees Seefeldt, Mastrangelo and Pamela Klute,

Trachte's VP of Human Resources, (collectively, "the Trustee Defendants"). After realizing at the eleventh hour that they faced a conflict of interest and were not qualified to assess the transaction, the Trustee Defendants hired defendants Alpha Investment Consulting Group, LLC ("Alpha") and John Michael Maier to serve as "independent fiduciaries" of the Trachte ESOP, review the transaction and direct the trustees. Unfortunately, Alliance and the trustees restricted the scope of Alpha's authority and obligations and did not appoint Alpha properly as a directing trustee.

As a result of the Alliance Defendant's orchestration and the Trustee Defendant's negligence and conflicts of interest, questionable judgments were made in the valuation of Trachte without independent scrutiny and the Trachte ESOP paid more than fair market value. Ultimately, Trachte could not afford the debt load that it incurred as part of the 2007 Transaction. The 2007 annual valuation for the Trachte ESOP placed Trachte's equity value at $16.99 million. By 2008, the value was $0.

Plaintiffs brought this suit under ERISA, 29 U.S.C. § 1001, *et seq.*, alleging numerous breaches of ERISA fiduciary duties by Alliance and Fenkell as fiduciaries of the Alliance ESOP; by Seefeldt, Mastrangelo and Klute as trustees of the Trachte ESOP; by Alpha and Maier as fiduciaries of the Trachte ESOP; and various forms of vicarious liability against all defendants. The court held a liability trial from October 11, 2011, to October 19, 2012, and based on the factual findings set forth below, the court finds:

(1) defendants Seefeldt, Mastrangelo and Klute breached their fiduciary duties to the Trachte ESOP under ERISA § 404(a)(1)(D) to follow plan terms by attempting to abdicate

their duties and choosing to accept Alpha's direction;

(2) Seefeldt, Mastrangelo and Klute violated ERISA § 406(a)(1) by causing the Trachte ESOP to enter a prohibited transaction without adequate consideration;

(3) Seefeldt, Mastrangelo and Klute are not liable for any failure to monitor under ERISA § 404(a) or for any breaches by one another or by Alpha under ERISA § 405(c);

(4) defendants Alpha and Maier did not violate ERISA § 406(a)(1) because they were not acting as functional fiduciaries of the Trachte ESOP;

(5) defendants Alliance and Fenkell breached their fiduciary duties of loyalty and care under ERISA § 404(a) to the Alliance ESOP by using the accounts of the Trachte employees for their own purposes;

(6) Fenkell violated ERISA § 406(b) by dealing with plan assets in his own interest and receiving consideration from a party dealing with the plan;

(7) Alliance is liable as co-fiduciary for Fenkell's breaches under ERISA § 405(a) and for breaching its duty to monitor Fenkell under ERISA § 404(a); and

(8) equitable relief is appropriate under ERISA § 502(a)(3) against defendants AHI and AH Transition for the fiduciary breaches of Alliance and Fenkell, but no other liability is appropriate under ERISA § 502(a)(3).

## MOTION TO STRIKE ROBERT GROSS' EXPERT TESTIMONY

Prior to trial, the court reserved judgment on plaintiffs' motion to strike portions of Robert Gross' expert testimony. (Dkt. # 473.) Gross opined that it was appropriate for Barnes Wendling to include a $1.9 million "tax-shield" in its valuation of Trachte for the 2007 Transaction, because the Trachte ESOP received a tax benefit from its leveraged ESOP purchase, while the Alliance ESOP gave up those tax benefits. Plaintiffs argued that his opinion was contrary to the commonly accepted valuation principles for determining fair market value (namely, that one should assume a hypothetical buyer and seller with no special characteristics), was not supported by peer-reviewed publications and was contrary to the opinions of all the other experts in this case.

After hearing the testimony of the valuation experts, the court concludes that it was not appropriate to include a tax shield in assessing a company's fair market value for a sale between two ESOPs. The court will nevertheless deny plaintiffs' motion to strike Gross' testimony. Gross attempted to apply general valuation principles to assess the unique structure of the 2007 Transaction. Despite the clarity of the general principle for assessing fair market value, the valuation experts noted some uncertainty about this issue and the court benefited from hearing arguments on both sides. Given the uniqueness of this transaction, it is unsurprising that Gross could not cite peer-reviewed literature for his opinion and, in that respect, his opinion was no better or worse than the other valuation experts in this case.

## FACTS

### A. The Parties

#### 1. Named Plaintiffs

The named plaintiffs Carol Chesemore, Daniel Donkle, Thomas Gieck, Martin Robbins and Nannette Stoflet are all former and current employees of Trachte. Each was a participant in the Old Trachte ESOP until their accounts were transferred to the Alliance ESOP on September

18, 2002. They remained participants in the Alliance ESOP until August 29, 2007, when the Alliance ESOP transferred all of its accounts held by Trachte employees to the new Trachte ESOP as part of the 2007 Transaction. They remain vested participants in the Trachte ESOP.

## 2. Trachte Defendants

Nominal defendant Trachte ESOP is an employee benefit plan for Trachte employees established on August 22, 2007, in anticipation of the 2007 Transaction. The Trachte ESOP is a defined contribution employee benefit plan under 29 U.S.C. § 1002(3). Trachte is a manufacturer of steel, self-storage systems. Trachte had three wholly-owned subsidiaries: Trac-Rite Door, Inc., a Wisconsin corporation; Fire Facilities, Inc., a Wisconsin corporation; and Store–N–Save Self Storage, Ltd., a Canadian corporation. As a result of the 2007 Transaction, Trachte became 100% owned by the Trachte ESOP.

Stephen Pagelow was Trachte's chief executive officer and chairman of its board of directors until his retirement in the summer of 2007. He began working at Trachte in 1977 and became its president in 1980, taking the reins from his father-in-law. Pagelow purchased a controlling interest and became chairman in 1984. In 1987, he caused Trachte to establish an employee stock ownership plan (the "Old Trachte ESOP") and sold some of his ownership interest to it. The named plaintiffs were all participants in the Old Trachte ESOP. During Pagelow's tenure, Trachte grew from 12 employees to approximately 200 employees. Between 1991 and 2002, its revenue increased from approximately $5 million to more than $42 million.

## 3. The Alliance Defendants

In September 2002, Trachte was purchased by defendant Alliance. Alliance is a holding company that specializes in acquiring ESOP-owned and closely-held operating companies with limited marketability, allowing the owners to sell their interest but remain involved in management. Consistent with its business model, Alliance typically holds the companies for a short time and then divests them, hopefully at a profit. From 2002 until the 2007 Transaction, Alliance controlled directly or indirectly over 75% of the voting power of Trachte stock. On April 12, 2007, it assigned all of its Trachte stock to its wholly-owned subsidiary, defendant AHI.

At the time of the 2007 Transaction, 53% of Alliance's common equity was held by nominal defendant Alliance ESOP. The remainder was held by defendant AH Transition Corp., a wholly-owned subsidiary of the Alliance ESOP.[1] The Alliance ESOP is an employee benefit plan for employees of Alliance and its holding companies. Its assets consist of cash, shares of Alliance and shares of AH Transition, allocated to participant accounts. At the end of 2006, the Alliance ESOP had 10,240 participants, 305 of which were Trachte employees. Since the formation of the Alliance ESOP in 1995, Alliance has been its sponsor and named fiduciary and held the authority to appoint its administrator and trustee.

Since Alliance's inception, defendant David B. Fenkell has been its president, its chief executive officer and the sole member of its board of directors. Since their inception, Fenkell has also been president and sole director for AHI and AH Transition and the sole trustee of the Alliance ESOP. In these various positions,

---

1. Although AH Transition Corp. is not listed as a defendant in the caption of the Second Amended Complaint, it is listed as such in the body of the complaint (dkt. #254, at ¶21) and has been treated by the parties as such.

Fenkell made Alliance's acquisition and divestiture decisions, usually in consultation with Alliance's director of acquisitions and one of its portfolio managers. In 2006 and 2007, Kenneth Wanko was the director of acquisitions. He also served as an officer of Alliance, AHI and AH Transition. Eric Lynn was the portfolio manager responsible for Trachte in 2006 and 2007. His job was to serve as a liaison and oversee the subsidiary's business performance. During that period, Wanko and Lynn were not members of Alliance's board of directors, nor trustees or named fiduciaries of the Alliance ESOP, and exercised no control over investment decisions for Alliance or the Alliance ESOP.

#### 4. The Trustee Defendants

Defendants Jeffrey Seefeldt, James Mastrangelo and Pamela Klute were appointed trustees of the Trachte ESOP from its adoption on August 24, 2007. Seefeldt and Mastrangelo were also appointed as the sole members of Trachte's board of directors on August 22, 2007, one week before the 2007 Transaction.

Seefeldt began working for Trachte in 1980 and was groomed as Pagelow's replacement. He became Trachte's president in 2002 and became CEO sometime in the summer of 2007. In September 2009, Seefeldt resigned as president, board member and trustee.

Mastrangelo was hired as Trachte's chief financial officer in September 2004 and became its executive vice-president and chief operating officer on July 23, 2007. He resigned as an officer and board member in April 2011, but remains a trustee of the Trachte ESOP.

In 1995, Klute was hired by Trachte for its human resources department. She was vice president of human resources at the time of the 2007 Transaction. Klute was also president of the Wisconsin Chapter of the ESOP Association from 2005 until 2009, and remains a trustee of the Trachte ESOP.

#### 5. Alpha Defendants

Defendant Alpha Investment Consulting Group, LLC ("Alpha") provides investment services to fiduciaries of retirement plans, foundations and endowments. On August 13, 2007, Alpha was appointed as an "independent fiduciary" to the Trachte ESOP for the 2007 Transaction. Defendant John Michael Maier has been a senior consultant and partner with Alpha since July 1, 2007. Maier was the only person at Alpha who performed substantive work for Trachte. He reviewed the 2007 Transaction and signed a letter purporting to direct the Trachte trustees to proceed with the transaction.

### B. 2002 Transaction

By 2002, Pagelow was seeking to wind down his participation in Trachte. At that point, he owned approximately 42% of the company; the old Trachte ESOP owned 30.34%; and assorted private individuals owned the remaining shares.

Alliance provided his exit strategy. On September 18, 2002, Alliance acquired 80% of Trachte's common stock for $24 million ("the 2002 Transaction"). Alliance also acquired Trachte preferred stock valued at $2 million. Pagelow retained ownership of 20% of Trachte's common stock and received a 40% ownership of Store–N–Save, with Trachte retaining the remaining 60%. Store–N–Save was previously a wholly-owned subsidiary of Trachte

Recognizing Pagelow's value to Trachte, Alliance insisted he remain with Trachte for five years as chairman of Trachte's board of directors. In exchange, Pagelow received a put option on his Trachte stock payable beginning in October 2007 and a put option for his Store–N–Save stock beginning in 2009. The Trachte put option

gave Pagelow the right to tender his shares to Trachte based on the company's prior year appraisal value.

As part of the 2002 Transaction, Alliance merged the old Trachte ESOP into its Alliance ESOP. Alliance common stock was exchanged for all the Trachte common stock held by the Old Trachte ESOP, the employee accounts were transferred into the Alliance ESOP and the Old Trachte ESOP was dissolved. The Trachte employees became participants in the Alliance ESOP, with accounts that held Alliance common stock allocated to them to equal the value of their previous accounts.

The last relevant feature of the 2002 Transaction is that Trachte was required to establish two "phantom stock plans," one for Trachte employees and another for Alliance employees. These stock-based, deferred compensation plans were designed to provide an incentive to grow Trachte for resale. Eligible high-level Alliance and Trachte employees would receive cash payments based, in part, on changes in the value of Trachte stock. Pagelow and Fenkell were participants in these respective phantom stock plans. Benefits under both plans were to be paid by Trachte.

The two phantom stock plan documents, which are identical in all relevant respects, defined a formula for awarding units of phantom stock and the conditions to trigger payment of benefits. (Fenkell Decl., Exs. F, G, dkt. ## 300–6, 300–7.) The amount of a participant's benefits started at zero and increased solely upon future appreciation of Trachte's common equity. (*Id.,* at §§ 1.19 and 5. 1, cross referencing § 1.22) A change in control of the ownership of Trachte was a "Triggering Event" under both plans. (*Id.,* at §§ 1.7, 1.27, 1.29.) Upon a triggering event (other than dissolution or liquidation), "[Trachte], at its option, may either (i) pay each Participant or (ii) not make such payments and continue this Plan." (*Id.,* at § 5.1.)

## C. Trachte's Performance Under Alliance

According to Trachte's annual, audited financial statements, its combined net sales

increased between six and eight million dollars each year from 2003 until 2006, rising from $52 million in 2003 to $75 million in 2006. Trachte's overall profitability, however, was flat during this period; its annual EBITDA (excluding its subsidiary Store–N–Save) was $5.7 million in 2003; $4.5 million in 2004; $6.8 million in 2005; and $6.3 million in 2006. By the end of 2006, Trachte's sales revenues were declining. Sales decreased 13% and 11% in the third and fourth quarters of 2006 compared to the same period in 2005. Nevertheless, according to the annual valuations performed for the Alliance ESOP by Alliance's retained appraiser Stout, Risius and Ross ("SRR"), the paper value of Trachte's common equity increased steadily, from $25.4 million in 2003, to $28.09 million in 2004, $42.14 million in 2005 and $44.94 million in 2006.

During this same time frame, Pagelow was gradually winding down his activities for Trachte. After the 2002 sale, he resigned as president and was replaced by Seefeldt, who assumed day-to-day management of the company. Pagelow also reduced his hours from 50 to 60 hour weeks to 32 hour weeks, a number which declined further over time.

On September 2, 2005, Pagelow entered an agreement to exercise his put option early on 25% of his remaining Trachte shares. He sold 3,373.5 shares for $566 per share, for a total of just over $1.9 million, based on the prior year's appraisal value. The parties agreed that the same methodology would be used when he exercised the remainder of his put option. Pagelow reduced his hours further to twenty hours a week, but agreed to remain employed for two more years, until September 1, 2007.

In November 2005, Pagelow informed Fenkell that he wanted to exercise his remaining put option on the Trachte Stock.[2] This decision was apparently precipitated by Pagelow breaking his hip in July 2006. As a result, Pagelow went to the office only one day throughout the remainder of 2006, but remained involved with the Trachte business. He was present and presided as chairman over the November 15, 2006 Trachte Board of Directors meeting. He also participated by phone in a practice run of management's presentation to potential third-party buyers of Trachte. In early 2007, he resumed working twice a week, eight hours each day.

Consistent with Pagelow's agreement to extend his employment by two years, Pagelow did not formally resign as Trachte's CEO and chairman until August 29, 2007, even though Seefeldt was assuming ever greater responsibilities in the months leading up to that date. Indeed, Pagelow had de facto stopped working as CEO and chairman by the summer 2007, when Mastrangelo became COO and Seefeldt became CEO.

## D. Alliance's Attempts to Sell Trachte to Third Parties

In early 2006, Fenkell and Alliance concluded that it was time, perhaps past time, to offload Trachte. Pagelow's request to exercise his remaining put option placed pressure on Alliance in several respects. Because Alliance was responsible for redeeming his shares and lacked the liquidity to satisfy his put option, it would have to borrow money or sell Trachte. More importantly, Alliance and particularly Fenkell had doubts about Trachte's future performance without Pagelow's leadership. Even with Pagelow's involvement, Fenkell and Alliance were worried that Trachte's growth potential was exhausted. Not only had the self-storage market as a whole matured and shown signs of stalling,

**2.** By this time, Alliance owned 84.7% of Trachte and Pagelow the remaining 15.3%.

Trachte had pushed its sales revenues aggressively during Alliance's four-year ownership, increasing its net sales almost 70% with no appreciable improvement in its gross profit. Accordingly, Alliance worried that Trachte's rapid growth and profit margins were not sustainable. By the end of 2006, Fenkell had evidence that Trachte sales were beginning to decline. Finally, Alliance's business model created pressures to sell Trachte. Alliance had a majority of its equity tied up in Trachte. A sale of Trachte could provide needed liquidity to fund new acquisitions and diversify its risk.

Fenkell and Alliance recognized they had three strategic alternatives: (1) recapitalize Trachte, (2) sell Trachte to a third party or (3) sell Trachte internally through a newly-formed Trachte ESOP. Given their negative view of Trachte's potential for future growth and of its management's abilities, Alliance quickly rejected recapitalizing Trachte. Between the two remaining options, Alliance preferred to sell Trachte to a third party. From their experience, Fenkell and Wanko predicted Trachte would fetch around $50 million in an independent sale, exclusive of Store–N–Save, compared to $45 million in a leveraged buyout by management. Fenkell also doubted whether management would be able to obtain financing. Accordingly, Alliance decided to pursue a sale to an independent third party.[3]

### 1. Marketing Trachte

After unsuccessfully attempting to market Trachte to strategic buyers on its own in the first half of 2006, Alliance decided to hire a firm to do so. At Wanko's suggestion, Seefeldt signed an engagement agreement on behalf of Trachte with William Blair, an investment banking firm. The agreement set an expected transaction consideration of between $45 and $55 million, exclusive of Store–N–Save. William Blair sent marketing materials to a wide range of prospective strategic and financial buyers using projections developed by Trachte's sales department under Mastrangelo's supervision. These materials predicted that Trachte would achieve sales of $71.2 million with an EBITDA of $7.8 million in 2006.

In November 2006, William Blair received letters of intent from four prospective buyers: Tricor Pacific Capital, Inc. ("Tricor"); Watermill Group; Lincolnshire Equity Fund III, L.P. ("Lincolnshire"); and H.I.G. Capital, LLC ("HIG"). The proposed terms fell short of Alliance's predictions, ranging from $28 to $41.3 million. The prospective buyers received additional financial information and attended a presentation by Trachte management in December 2006. In February 2007, three of the buyers submitted revised offers, ranging from $32 to $40.77 million. (Pls. Ex. 74, dkt. # 491–2.)[4]

At the August 2006 Trachte board of directors meeting, Fenkell and Alliance learned that Trachte's year-end sales were predicted to be 2.5% below budget for 2006 (though still 6% ahead of 2005) and that first half margins were 24.2% below budget. (Joint Ex. 6, dkt. # 584–1, at 4.) At

---

**3.** There is little doubt in the court's mind that Fenkell—as a sophisticated and experienced buyer and seller of privately-held companies with a meaningful ESOP—understood the benefits of a clean, independent sale to an arms-length buyer for purposes of cashing out his phantom stock while meeting all ERISA obligations.

**4.** While the summary of offers in plaintiffs' exhibit 74 was never formally admitted, Wanko examined the summary and testified that it was accurate. (Tr. 3–B–9, dkt. # 666.) At that time, the document appears to have been misidentified as plaintiffs' exhibit 4, but none of the defendants objected during Wanko's testimony, so the court will overlook the omission. (*Id.*)

the November 2006 board meeting, Mastrangelo told the board that these margins were actually below 2005 levels and forecasted net operating income and EBITDA for 2006 would fall about $500,000 short of the projections sent to prospective buyers in the William Blair marketing materials, which Mastrangelo attributed to higher steel prices and an unanticipated one-time expenditure. (*Id.*) At the meeting of the compensation committee for Alliance in December 2006, Fenkell repeated these concerns about Trachte's lower sales and earnings.

### 2. Trachte Management's Initial, Unsolicited Letter of Intent

In the summer of 2006, Seefeldt and Mastrangelo learned through Pagelow of Alliance's plan to sell or recapitalize Trachte. They discussed among themselves and with Pagelow the possibility of making an offer on behalf of Trachte management or a to-be-formed ESOP. In early fall, Seefeldt and Mastrangelo asked Pagelow to communicate their interest in pursuing a management-led buyout to Alliance, which he did at the November board of directors meeting.

In December 2006, Seefeldt and Mastrangelo engaged Anderson for advice in developing their proposed ESOP purchase of Trachte. Brian Anderson was an attorney at DeWitt Ross & Stevens, had around 20 ESOP clients and was a member of the ESOP Association and the National Employee Ownership Council. Anderson was familiar with Trachte management, because Trachte engaged him in 2000 with respect to the old Trachte ESOP and he had continued working on its other benefit plans.

On February 6, 2007, around the time the third-party buyers were submitting their revised offers, Seefeldt and Mastrangelo submitted a letter to Fenkell and Pagelow proposing to purchase Trachte without Store–N–Save for $42 million (the "February 6 letter of intent"). (Joint Ex. 19, dkt. # 586–5.) The letter proposed that the Alliance ESOP would spin off the accounts of Trachte employees into a new Trachte ESOP, which would then leverage the accounts for a $24 million loan to purchase Trachte; Pagelow would provide a $2.1 million seller's note; and the new company would remain liable for $3.79 million in unfunded customer deposits, $4.2 million in phantom stock and $300,000 in ESOP notes. Mastrangelo and Seefeldt based their proposal on what they learned from the William Blair presentations, their knowledge of the market and past valuations of Trachte for the Alliance ESOP. Their offer assumed EBITDA would increase roughly one million dollars each year from $8 million in 2007 to $11 million in 2011.

Alliance did not respond formally to Mastrangelo and Seefeldt's proposal. Instead, Fenkell informed them by phone that Alliance was not interested, because he doubted that they could obtain financing.

### 3. HIG Offer

Alliance and Pagelow entered a nonbinding letter of intent with HIG on February 2, 2007, under which HIG proposed to purchase a 100% interest in Trachte exclusive of Store–N–Save for $40.8 million. The letter of intent proposed that HIG would pay $37.5 million in cash and assume $3.3 million in unfunded customer deposits, but it expressly excluded payments under either phantom stock plan. It also included a 45–day period of exclusivity until the end of March 2007 for HIG to perform its due diligence.

Based on information it received from Trachte management, HIG concluded that the self-storage industry was unlikely to sustain significant growth and that

Trachte's late 2006 and early 2007 sales were *below* prior years. (Pls. Ex. 147, dkt. # 596–5; Hanneman Dep., dkt. # 576, 83–84.) After HIG raised these concerns with Alliance, Trachte's management attempted to allay HIG's concerns through personal interviews, a conference call and a memorandum sent by Mastrangelo. (Trustee Defs. Ex. 1582, dkt. # 591–54.) From these conversations, HIG concluded that management itself was skeptical about its ability to meet the 2007 projections.

On April 5, 2007, HIG submitted a revised letter of intent to purchase Trachte for $32 million in cash, $3.3 million in unfunded customer deposits and a $5.5 million "earn-out" dependent on Trachte's performance in 2007. (Joint Ex. 36, dkt. # 595–2.) Alliance would receive the full earn-out if Trachte achieved its predicted EBITDA of $8.16 million in 2007; a prorated earn-out to the extent it exceeded its 2006 EBITDA of $6.48 million; and no earn-out if it fell below the latter figure. This proposal also excluded payments triggered by the phantom stock plan.

In justifying this revised offer, HIG pointed out that Trachte had been experiencing gross revenue problems for three quarters or more, its revenues had been flat for the last twelve months, and its EBITDA would be flat through the first half of 2007. (Pls. Ex. 147, dkt. # 596–5.) Officials from Alliance and HIG exchanged informal emails, but Alliance never responded officially to HIG's offer.

### E. Alliance Returns to Trachte Management

Once it became apparent that Trachte would not sell at Alliance's desired price on the open market, Alliance turned to its second option, a leveraged buyout by Trachte management. On April 4, 2007, at Fenkell's direction, Wanko asked Seefeldt and Mastrangelo to resubmit their letter of intent.

Seefeldt and Mastrangelo were unaware of the precise terms of earlier offers, since they were not privy to the letters of intent or the subsequent price negotiations with HIG. Mastrangelo, however, was aware that the HIG deal had fallen through because HIG was concerned with the drop in Trachte's revenue and in the self-storage market. He knew margins in late 2006 were below the prior year and sales in the first quarter of 2007 were below budget.

In addition, Karen Hitchcock distributed a memo in March of 2007 to senior management, including Pagelow, Seefeldt and Mastrangelo, predicting a likely decline in Trachte sales and revenue based on a decline in the self-storage market precipitated by a housing slump. (Pls. Ex. 135, dkt. # 595–14.) Seefeldt knew the housing market was in a slump by March 2007, but dismissed her memo as a doomsday prediction.[5] Mastrangelo considered revising their previously-rejected initial $42 million letter of intent in light of Trachte's performance over the last few months, but decided instead to submit the same letter as an opening for negotiations.

After a few conversations, Mastrangelo asked Wanko to put together a draft letter of intent. Alliance's counsel drafted a new letter of intent and sent it to Mastrangelo and Seefeldt on April 12, 2007. (Alliance Ex. 2558, dkt. # 592–7.) That same day, Alliance assigned all of its shares of common and preferred stock of Trachte to its wholly-owned subsidiary AHI which remained the majority shareholder of Trachte until the closing on August 29, 2007.

---

5. In fact, she predicted a collapse in October 2007, while the self-storage market did not fall out until 2008.

A final, non-binding letter of intent was executed on April 19, 2007.[6] (Joint Ex. 21, dkt. # 586–7.) Consistent with the February 6 letter of intent, it proposed that a to-be-formed Trachte ESOP would purchase a 100% interest in Trachte for $42 million and Store–N–Save for $9.33 million. The April 19 letter of intent set an anticipated closing date of May 31, 2007, and was signed by Seefeldt and Mastrangelo on behalf of a to-be-formed Trachte ESOP, Seefeldt on behalf of Trachte, Wanko on behalf of AHI, and Pagelow for himself.

Although the values changed, the April 19 letter of intent set the final framework of the 2007 Transaction. Mastrangelo and Seefeldt would set up and serve as trustees of a new Trachte ESOP. The Alliance ESOP would spin off its accounts held by Trachte employees, containing $7.5 million worth of Alliance stock, into the new Trachte ESOP. Alliance would sell the new Trachte ESOP $7.5 million in Trachte common shares for a promissory note, which the Trachte ESOP would pay off with the Alliance stock. Using the employee accounts as part of its collateral, Trachte would then take out a bank loan of $27.5 million, pay off the phantom stock plan for Alliance employees of $4.9 million (but not the plan for Trachte employees), pay $2 million in cash to redeem preferred stock held by Alliance, and $13.6 million ($4.5 million in cash and $9.1 million in subordinated promissory notes) to redeem common stock held by Alliance and Pagelow. Finally, Trachte would loan the remaining proceeds to the Trachte ESOP, which it would use to purchase all outstanding common shares held by Alliance and Pagelow for $19.98 million. The letter contained no provision for customer deposits.

The April 12 draft letter of intent also provided that SRR would perform all valuation appraisals for the transaction, for both sides. For the last three years, Alliance had engaged SRR to provide the annual valuations for the Alliance ESOP. Anderson objected to this provision because he did not believe SRR was sufficiently independent of Alliance. He told Alliance's counsel that he had no serious problems with SRR performing the valuation but was uncomfortable with Trachte relying on SRR for the fairness opinion. (Trial Tr. 1–B–31–32, dkt. # 648.) The final April 19 letter of intent provided that SRR would provide "all valuation appraisals" and that "all fairness opinions required by Trachte ESOP will be issued by one of (1) GBQ Capital Partners, LLC, (2) Moore Stephens Apple or (3) Barnes Welding Valuation Services." (Joint Ex. 21, dkt. # 586–7, ¶ 4(a).) The parties understood that the firm supplying the fairness opinion would still have to rely on the appraisal by SRR.

## F. Review of the 2007 Transaction

### 1. Trustee Defendants' Legal Representation

In April 2007, Seefeldt and Mastrangelo engaged their attorney, Brian Anderson, to draft the ESOP plan, advise them about their fiduciary roles and provide due diligence regarding the 2007 Transaction. Anderson did not provide financial advice, but advised them about structure of the deal, focusing on ERISA fiduciary and compliance issues. He reviewed most of the important documents, including the letter of intent and the engagement letters with the various service providers and had primary responsibility for drafting the

---

**6.** As counsel for Mastrangelo and Seefeldt, Brian Anderson exchanged several drafts of the letter of intent with Trachte's corporate counsel and Alliance's counsel between April 17 and 19, 2007. However, the structure of the transaction as outlined in the April 12 draft remained essentially unchanged from then on.

Trachte ESOP plan document and summary plan document.

Seefeldt also engaged William Peck to serve as Trachte's corporate counsel, in particular to review the credit agreements. From April through the close of the transaction, counsel for Alliance, Peck and Anderson exchanged numerous drafts of transaction documents.

### 2. Loan Due Diligence by JP Morgan Chase

Seefeldt and Mastrangelo initially approached JP Morgan Chase, N.A. in December 2006 to discuss financing for their plan to purchase Trachte. They returned to Chase after executing the April 19 letter of intent. From April 2007 through August 29, 2007, Mastrangelo provided information to Chase, its mezzanine finance group, Chase Capital, and their lawyers. Mastrangelo was in weekly contact with Chase and provided it with periodic forecasts and financial information, including the monthly unaudited financial statements. He also assisted Chase in sensitivity analyses designed to determine whether Trachte could meet its debt obligations in the event that its performance fell below forecasts.

Wanko also helped arrange the financing from Chase by assisting in the development of several presentations, sitting in on meetings with Chase and having at least one personal conversation with Chase employees. (Pls. Ex. 200, dkt. # 597–4.) Ultimately, Chase provided Trachte with a first lien loan of $12.5 million and a second lien loan of $15 million. The loan covenants required Trachte to maintain a ratio of debt to EBITDA lower than 4.5.

### 3. Valuation by Stout, Risius and Ross

Since 2004, SRR had performed an annual valuation of all stock held directly or indirectly by the Alliance ESOP, including Trachte as a subsidiary of Alliance. (Joint Ex. 12, dkt. # 585, 1–4; Joint Ex. 13, dkt. # 585–5.) Mastrangelo had supplied SRR with documents and financial information for these valuations each year since approximately 2004. Before the 2007 Transaction, SRR's last annual valuation was issued as of December 31, 2006, and placed Trachte's value at $44.94 million and its EBITDA at $6.3 million. In each of the three prior years of Alliance's ownership of Trachte, SRR's annual valuations were consistently rosy. Although Trachte's EBITDA was relatively flat, moving from $5.7 million in 2003 to $6.3 million in 2006, SRR found Trachte's equity value had risen from $25.4 million to $44.94 million. Between 2003 and 2004, its EBITDA fell 21%, while SRR's valuation of its equity increased 10.6%.

Fenkell, as trustee for the Alliance ESOP, retained SRR to provide a "take-down letter" (or "bring-down letter") for the 2007 Transaction. These letters would update SRR's December 31 valuation of Trachte common stock to the closing date of the transaction. The primarily responsibility for the "take-down" letters fell to Susan Gould, the managing director of SRR's ESOP practice group. The report was produced by Jeff Buettner, a manager in SRR's ERISA and ESOP valuation group. Buettner had an MBA, had worked in ESOP valuations since 1999 and was a member of the National Center of Employee Ownership and of the ESOP Association, where he was on the Valuation Advisory Committee.

SRR's engagement letter defined the scope of its services. It stated that SRR would provide a valuation of Alliance common stock for the trustee of the Alliance ESOP to use in conjunction with the transaction. (Joint Ex. 20, dkt. # 586–6.) It further provided that its "analysis will be solely for the purpose stated herein, and

should not be referred to or distributed for any other purpose, in whole or in part, without our prior written consent." (*Id.*) Having developed the annual report and letter to serve Fenkell's purposes as trustee of the Alliance ESOP, SRR included this provision to limit its legal liability if others relied on the valuation. SRR believed it was acceptable for others to read the letter and consider its analysis, but they could not rely on SRR's conclusions without performing their own independent analysis.

In late April, before receiving the finalized letter of intent, Susan Gould realized that Fenkell expected the firm providing the fairness opinion for the Trachte trustees to rely on SRR's valuation. Gould thought that it "sounded strange" for a valuation company to provide a fairness opinion without performing its own valuation. (Pls. Ex. 195, dkt. # 597–3.) Neither Buettner nor Gould had been involved in a transaction in which SRR performed services for both the buyer and the seller, which they regard as a conflict of interest. Gould was also concerned with SRR's potential liability if the Trachte trustees relied on the SRR valuation to fulfill their obligations under ERISA.

On August 29, 2007, SRR issued three, three-page take-down letters to Fenkell as trustee of the Alliance ESOP. The letters express SRR's opinion that, as of August 29, 2007, the fair market value of (1) Trachte common stock was $13.725 per share, (2) Alliance common stock was $17.15 per share, and (3) AH Transition common stock was $23.65 per share. (Joint. Ex. 30–31, dkt. ## 587–1, 587–2, 587–3.) SRR placed the overall fair market value for Trachte's common equity at $44.1 million.

As compared to SRR's annual valuations, the take-down letter for Trachte's stock had five noteworthy features. First, SRR's treatment of Trachte's cash on hand changed between its annual valuations. The take-down letter included all cash in excess of "customer deposits" (advances on future builds) as part of Trachte's common equity value, which assumes Trachte did not require any cash as operating capital beyond the customer deposits. In contrast, SRR's annual valuations had previously concluded that Trachte needed $2.5 million in working capital in 2004 and $4 million in 2005, including only cash in excess of these amounts as part of Trachte's equity.[7] The 2006 valuation included only "non-operating capital" in Trachte's equity value without identifying the specific amount of working capital assumed. (Trial Tr., dkt. # 676, 33–41.)

Second, SRR included a $1.9 million tax shield in its 2006 annual valuation of Trachte, but not in its take-down letters. The annual valuation included a tax shield because the Alliance ESOP could take tax deductions on principal and interest payments for the loan used to purchase Trachte in 2002. SRR did not include this tax shield in its take-down letters because the loan that provided this tax benefit to the Alliance ESOP would be paid off during the transaction. (*Id.* at 46–53.)

Third, SRR applied a 5% discount for lack of marketability in its 2006 annual valuation of Trachte, but not in the 2007 take-down letters. (*Id.*) Privately-held companies that lack a readily available market are often accorded a "lack of marketability discount," the precise amount of which requires judgment on behalf of the appraiser. The take-down letters for Alliance and AH Transition stock did provide a 5% discount for lack of marketability.

---

**7.** The cash from customer deposits was included as part of working capital, but SRR did not assume that those deposits covered all of Trachte's working capital needs.

According to Buettner, once the discount for lack of marketability was taken at the level of the Alliance stock, it did not need to be repeated again at the Trachte level.

Fourth, the take-down letter did not subtract the phantom stock liabilities from Trachte's value, although the letter noted this limitation. (Joint Ex. 30, dkt. # 587–1, at 2.) Again, SRR justified the lack of subtraction on the grounds that those liabilities had already been subtracted in its valuation of Alliance stock.

Fifth, the take down letter and the 2006 annual valuation used management's fall 2006 projections for adjusted net income in 2007 and for gross revenue from 2007 through 2011. SRR never asked for or received revised projections, although it had reason to believe such projections would be useful. In particular, Buettner was aware management had supplied Barnes Wendling with updated projections, but never asked to see them. Wanko also told Gould that Trachte's projections were "quite shaky" and Trachte would likely miss management's gross revenue projections for 2007. Moreover, Gould believed the HIG deal fell through because of the downward trend of orders in 2007 and because HIG doubted Trachte would meet its 2007 budget, particularly its predicted EBITDA growth from $6.5 to $8 million, which Gould herself regarded as "hefty." [8]

Although SRR did not take into account management's revised projections, it did have Trachte's unaudited monthly financial statements through June 30, 2007. It noted that Trachte's EBITDA for early 2007 was higher than budget, but also knew that Trachte's margins had benefitted from fortuitously low steel prices. (Trial Tr., dkt. # 676, 99, 103.) SRR also noted that management was taking steps to enhance their margins, such as cutting its 401k plan, cross-training employees and redesigning products to reduce their steel content. (*Id.* at 102.) SRR did not consider data after June 30, 2007, although the transaction did not close until August 29, 2007.[9]

### 4. Fairness Opinion by Barnes Wendling Valuation Services

Anderson researched the three valuation firms listed in the letter of intent and recommended the trustees hire Barnes Wending Valuation Services, Inc. On May 10, 2007, Seefeldt and Mastrangelo signed a letter engaging Barnes Wendling to provide a fairness opinion in connection with the 2007 Transaction. (Joint Ex. 22, dkt. # 586–8.) Barnes Wendling was hired to provide "an independent opinion that the consideration to be paid in the proposed transaction is within a range of fairness." (*Id.*) A fairness opinion evaluates the fairness of the whole transaction, including whether the buyer is paying fair market value and other features of the transaction, such as the financing.

Barnes Wendling was not engaged to perform a complete appraisal of Trachte's fair market value. In its initial draft engagement letter, Barnes Wendling proposed completing a full valuation report. This was removed from the engagement

---

8. Buettner claims to have had conversations with Mastrangelo that indicated none of the revisions were material, but at his deposition he had no recollection of revised projections and he could not explain what he used to refresh his memory. (Trial Tr., dkt. # 676, at 55–59.) SRR did include a 6% discount in its calculation of the weighted average cost of capital for risk factors specific to the compa-

ny, which might have taken into consideration the reliability of management's projections and the state of the self-storage market.

9. It is not clear whether Buettner failed to ask for updated information or, as he claims, he asked Wanko and Mastrangelo and they told him no more information was available. (*Id.* at 120–21.)

letter and Barnes Wendling was instructed that it *must* rely on the valuation by SRR. Barnes Wendling's analytical process for a "valuation report" and a "fairness opinion" was to be similar, but a valuation report would contain an explanation for the basis of its valuation opinion. Nevertheless, as counsel for Seefeldt and Mastrangelo, Anderson instructed Barnes Wendling to "look under the hood" on the SRR report to determine if SRR appropriately analyzed Trachte's value.

Rosanne Aumiller was the person at Barnes Wendling primarily responsible for performing the fairness opinion. She is a certified public accountant, with specialized credentials in business valuation from the American Institute of CPAs and in appraisal from the American Society of Appraisers. This was Aumiller's first ESOP valuation in the context of an ESOP transaction, though she had been involved with around 50 ESOP valuations for other tax purposes. Aumiller worked with a team of four other analysts, who together spent over a hundred hours reviewing the transaction.

Barnes Wendling reviewed and relied on the SRR valuation data but never spoke to anyone at SRR. They also requested and reviewed data and financial documents provided by Trachte, met with management in person and spoke to the loan officer from Chase. At some point, management revised its five year forecasts to reflect the lower than anticipated growth in sales and in the self-storage industry generally and gave those revisions to Barnes Wendling. Their engagement letter makes clear that they had no obligation to review the accuracy of the data provided by management.

During this process, Barnes Wendling sent several draft fairness opinions to See-feldt, Mastrangelo and Klute. Aumiller sent Mastrangelo and Seefeldt a document explaining some of its financial concepts. She also suggested to Mastrangelo that they hire a financial adviser to help them understand concepts with which Mastrangelo was unaccustomed, to avoid questions if things did not go well and to give them assistance in uncomfortable negotiations with Alliance. (Pls. Ex. 487, dkt. # 601–5.) [10]

Barnes Wendling issued its final fairness opinion on August 29, 2007. (Joint Ex. 29, dkt. # 587.) It used the SRR valuation as a starting point. Then, using the public guidelines company method (also known as the market approach), it estimated Trachte's value as between $25.1 and $37.65 million; using the discounted cash flow method, it estimated a value between $37.5 and $40.1 million. The letter lists these conclusions without explaining the company's underlying calculations (such as the company sales used for comparison in the market approach or the financial predictions used for its discount rate for the cash flow method), which it would have included in a full valuation report. Taking the high end from the discounted cash flow method and the low end from the market approach, Barnes Wendling concluded the fair market value of Trachte's total invested capital was $25.1 to $41.7 million.

To determine the value of Trachte's common equity, Barnes Wendling adjusted the total invested capital to account for cash on hand, customer deposits, Store–N–Save's value, Store–N–Save's debt to Trachte, a $1.9 million tax shield, the preferred equity and the phantom stock liability. These calculations were based on financial information from June 15, 2007. Barnes Wendling received information

---

**10.** In fairness, Aumiller was in part trying to persuade Mastrangelo to purchase additional

services from Barnes Wendling.

from July 31, 2007, but decided not to update the letter, because none of the figures changed more than $100,000, which it determined were not material changes. Ultimately, it concluded that the fair market value of Trachte's common equity ranged from $26.2 million to $40.1 million.

Barnes Wendling concluded that the total consideration of $45.234 million for Trachte's total equity and $38.329 million for Trachte's common equity (total consideration minus $2 million for preferred equity and $4.905 million for the phantom stock plan) fell within the range of reasonable values, albeit at the high end of the range. Barnes Wending also noted that the SRR valuation showed Trachte's common equity was worth $36.165 million, which when one adds the $1.9 million tax shield, showed Trachte had a value of $38.065 million, supporting its conclusion that the price was reasonable. Thus, Barnes Wendling concluded the ESOP was paying "adequate consideration" within the meaning of ERISA § 3(18) and the transaction was "fair to the ESOP from a financial point of view."

Barnes Wendling's analysis had the following pertinent features:

- it justified adding back in $1.9 million for the tax shield to Trachte's value, because the to-be-formed Trachte ESOP could deduct principal and interest payments on the loan;
- it did not consider prior offers for Trachte, because Aumiller was not made aware of Alliance's failed efforts to sell to an arms-length buyer (Aumiller asked Mastrangelo about prior offers and informed him that the opinion should consider serious offers);
- it did not include a discount for marketability of Trachte stock (Aumiller considered such a discount but decided it was not appropriate because the Trachte ESOP was obtaining a con-

trolling interest, but this analysis conflates two distinct concerns);

- it did not offer an opinion on the value of Alliance or AH Transition shares, but instead relied on SRR's valuation of the Alliance shares for the share exchange; and
- it limited its analysis of the loans to whether the interest rate and terms were fair and did not consider (1) how the debt load would likely affect Trachte's share value, (2) whether Trachte's cash reserves and expected cash flow were sufficient to service its debt or (3) what would happen if Trachte failed to meet its EBITDA projections;
- assumed all cash (except for customer deposits) was non-operating and counted it as part of Trachte's value.

**5. Criticism from Trachte Management and Employees**

During regularly-scheduled weekly meetings of Trachte's senior management between April 14 and August 29, 2007, putative trustees Seefeldt, Mastrangelo and Klute discussed the proposed 2007 Transaction with other senior management. From the beginning of those discussions, concerns were raised about a leveraged buyout by a new Trachte ESOP. At two of the weekly meetings, the trustees took an informal vote to see if senior management favored the leveraged buyout. Both votes favored the buyout, with four of the ten or eleven managers dissenting.

One manager, Jamie Lindau, was particularly persistent in his criticism. As Trachte's national sales manager, Lindau was responsible for developing Trachte's gross sales projections. From conversations with regional sales managers, Lindau had noted that Trachte was lining up fewer buyers for future purchases in 2006 than it

had in either 2004 and 2005. Even before learning about the precise price or debt levels, Lindau was worried Trachte would be unable to make sufficient sales to maintain the margins required for the transaction debt and raised his objections with both Pagelow and Seefeldt. Lindau also opposed the sale because he believed it was unfair not to permit current Alliance ESOP participants to vote on the transaction.

Around July 13, 2007, Seefeldt, Mastrangelo and Klute held a town hall meeting for all current Trachte employees to present the proposed transaction and to answer employee questions. They informed the Trachte employees that the value of their ESOP accounts would drop 77% at the close of the transaction due to the debt incurred to purchase Trachte, but that the accounts should regain 96% of their value within six years as the ESOP paid back the debt, assuming Trachte maintained at least a $6.3 million EBIDTA to service the debt. The trustees acknowledged that Trachte would be operating on "the narrow edge" to maintain its ability to pay the debt and to have cash for future opportunities, particularly in the first three years.

The meeting revealed significant employee resistance to the proposed buyout. Several employees expressed concern about the fairness of the price. The trustees acknowledged that the transaction was on the high end of value and that they wanted a price $4 to 5 million less, but replied that this was not a normal negotiation, since Alliance told them the price was "take it or leave it."

During the meeting, the trustees struggled to explain the benefits of an ESOP purchase. They argued that the only alternatives were for Alliance to sell or refinance using Trachte's assets, so that the company would face the same pressure to reduce costs but they would have no say in how that was accomplished. Moreover, they were worried that if Alliance sold Trachte, the employees' accounts would stay with the Alliance ESOP. In that case, the employees could no longer contribute to those accounts and their value would be affected by the future investment decisions of Alliance, over which they would have no say.

In reply, several employees pointed out that under the proposed Trachte ESOP, employees would also have no right to vote on Trachte business decisions, on the appointment of ESOP trustees or on ESOP investment decisions. When the employees pressed the trustees as to why they had no right to vote on the use of their pensions to finance the transaction or to vote about who served as trustees, the trustees responded that *Alliance* had decided there would be no vote.

### 6. ESOP Repurchase Obligations

On June 28, 2007, Mastrangelo, on behalf of Trachte, retained ESOP Economics to conduct a repurchase obligation study to estimate the number of shares of Trachte stock owned by the ESOP that would become eligible for distributions due to projected turnover, diversification and retirement. The study's purpose was to predict Trachte ESOP's liquidity needs to pay for required distributions under the plan terms. On August 3, 2007, ESOP Economics provided Mastrangelo with its final report entitled "ESOP Repurchase Obligation Projections." (Trustees Ex. 1595, dkt. # 591–63.)

### 7. Review of the Valuation and Fairness Opinion

While reviewing a draft of the Barnes fairness opinion, Mastrangelo was confused by Barnes Wendling's decision to add back in the tax shield. As a result, Mastrangelo hired RSM McGladrey Inc. to help the trustees understand the concepts

and terminology in the fairness opinion and the valuation. Thomas Klingele, RSM McGladrey's director of business valuation services, was assigned to explain what the reports meant and ensure they used normal methodology. He was not hired to perform a valuation of Trachte, or to render a fairness opinion. Klingele spent about 25.5 hours reviewing the final letter of intent and drafts of the fairness opinion and valuation.

On July 6 (or July 9), 2007, Klingele issued a letter on behalf of RSM McGladrey to Mastrangelo as "Trustee of a 'Trachte ESOP.'" (Joint Ex. 23, dkt. # 586–9.) The letter comments on a draft of the fairness opinion from July 2, 2007, the annual valuation from of December 31, 2006 and a draft of the take-down letter from June 30, 2007. Klingele concluded that the firms were using common and appropriate valuation methods (though he expressed no opinion that the methods were applied appropriately) and the EBITDA multiples used were within a reasonable range for companies of Trachte's size.

However, he noted that the Trachte ESOP was paying on the high end of the report's estimate range of fair market value and noted that the reports made some questionable assumptions. In particular, he noted that Barnes Wendling's adjustment for the tax shield "does not have consensus in the valuation community, especially under the 'fair market' standard of value," because it takes into consideration special features of the ESOP that are not relevant for the hypothetical willing buyer and seller. Klingele based this conclusion on his education and discussions, but he had no experience with valuations for ESOPs, did not discuss the tax shield with anyone and did not perform any research into its appropriateness. In conversations with Mastrangelo, Klingele further noted that the documents were unclear about how cash and customer deposits were be-

ing treated and that it was important for management to be comfortable with its projections, because they were the basis of the valuation under the discounted cash flow method.

Mastrangelo sent Trachte's "senior management" copies of the RSM McGladrey letter and invited them to a meeting with Klingele, which occurred on July 11, 2007. At the meeting, Klingele discussed the importance of the underlying projections and the EBITDA multiples. The meeting was the first time that Seefeldt learned about the tax shield issue and he understood that Trachte needed to ask Barnes Wendling about it.

Mastrangelo told Aumiller that he had hired RSM McGladrey, and about Klingele's criticisms. He did not show her the letter from RSM McGladrey. She stated her disagreement with Klingele but did not explain her reasoning. Mastrangelo decided there was no consensus about whether a tax shield was appropriate and chose to accept Aumiller's position. Seefeldt did not hear Aumiller's response, but also chose to defer to Mastrangelo's judgment.

On August 1, 2007, Seefeldt sought additional advice from Walter Smith, a CPA and independent director on the Trachte board from 1983 to 2006. Seefeldt asked for Smith's advice as one familiar with Trachte and experienced in buying, selling and valuing businesses. In 2002, Smith had voted for Trachte's merger with Alliance because he believed the Alliance ESOP provided Trachte employees with needed diversification, but Smith had resigned from the Trachte board of directors in August 2006 because he did not support Alliance's sale of Trachte. Smith sent his resignation letter to Pagelow expressing his opposition to the sale, but never informed Alliance about his opposition.

Smith met with Mastrangelo and Seefeldt on August 14, 2007, telling them that

the price and interest rates were too high and that their predictions were too optimistic in light of the slowing real estate and self-storage markets. Smith had no specific opinion about what would be a fair price, but thought the EBITDA multiples in the transaction appeared reasonable. Although the meeting lasted several hours, they did not delve into details and Smith never expressly advised them *not* to proceed with the transaction.

### 8. Negotiation

The $42 million sale price contained in the April 19 letter of intent was taken directly from Trachte management's original February 6 proposal, which was itself never the subject of negotiation by the parties. Although the letter of intent was a "nonbinding" agreement, the essential price for Trachte was not up for negotiation as made clear through (1) emails from Wanko (Pls. Ex. 200, dkt. # 597–4), (2) phone conversations with Fenkell, including one in which he berated Seefeldt with profanity for attempting to press Alliance on the refinancing of Store–N–Save, (3) the trustees responses at the Town Hall meeting and (4) Seefeldt and Mastrangelo's comments to the senior management and Walter Smith.

Nevertheless, some aspects of the letter of intent did change, ultimately reducing the overall price for Trachte's common equity from $42 to $38.6 million. Ultimately, Alliance agreed to the following concessions:

- to reduce its seller note by $1.29 million, because Alliance took on additional debt to acquire Spencer Turbine in May 2007, reducing its equity and thus the value of the Alliance shares in the Trachte employee accounts;
- to finance an escrow account to pay for around $150,000 for environmental cleanup at a Store–N–Save location, because the clean-up was necessary to refinance Store–N–Save as part of the transaction;
- to pay $180,000 to Trachte's labor union employees to offset concessions made regarding benefits in the contract renegotiations, which management insisted were necessary to enable Trachte's loan;
- to decrease the purchase price up to a maximum of $1.65 million to offset a floor-price provision added to the Trachte ESOP plan that guaranteed to participants who exercised a put right either (1) the fair market value at that time or (2) a percentage of the share value as of the 2007 Transaction;
- to permit Trachte to keep the cash on hand in excess of $4.5 million (ultimately, approximately $4.98 million); and
- to a last minute reduction in the overall purchase price of $1.5 million (no one seems to remember the purpose of this reduction).

### G. "Independent Fiduciary": Defendant Alpha

#### 1. Engagement of Alpha

Around August 1, 2007, Anderson met with Seefeldt, Mastrangelo and Klute about their fiduciary obligations and proposed hiring an "independent fiduciary" to help them evaluate this complicated transaction and protect them from liability. He suggested Michael Maier with Alpha Investment Consulting, LLC.

Mastrangelo had an initial phone conversation with Maier on August 3, 2007 to discuss hiring Alpha for the 2007 Transaction. Mastrangelo outlined the transaction and discussed the work Maier might perform, but did not define Alpha's precise role or the scope of its analysis. On August 6, Maier sent Mastrangelo and Anderson a draft engagement letter, a

copy of his curriculum vitae and a list of the types of documents that he would want to review for the transaction.

Maier and Mastrangelo discussed Maier's background in a general fashion, but Mastrangelo never obtained any references or asked about Maier or Alpha's experience acting as a fiduciary. Anderson believed Alpha and Maier had a good reputation in general, but had no specific knowledge about their experience. In fact, Maier was the only person at Alpha with any experience providing fiduciary services for ESOPs, and while Maier had significant experience with ESOPs, he had never been a non-directed trustee or an independent fiduciary for an ESOP transaction.[11]

Mastrangelo simply informed Seefeldt that they were hiring Alpha. Seefeldt played no role in evaluating Alpha or Maier's credentials or experience. Seefeldt did tell Pagelow that they were going to hire Alpha, because they were spending company funds and he believed Pagelow had the authority to deny the engagement. Finally, Klute played no role in hiring Alpha.[12]

Before Alpha was actually hired, Mastrangelo also believed Alliance would have to review and approve the engagement, a belief reinforced by Alliance's resistance to the engagement. Wanko was concerned that Alpha would delay the transaction and attempt to renegotiate parts of the deal. On August 10, Mastrangelo, Wanko and Maier had a conference call about Alpha's engagement. Maier understood the call was necessary to make Alliance comfortable with his participation. During the call, Wanko and Mastrangelo explained to Maier that he could not renegotiate the terms and his role was strictly limited to approving or disapproving the transaction. When Maier asked whether he should raise any issues he believed could be changed to improve the transaction for the ESOP, they both told him no, reiterating that his role was to provide a simple "thumbs up or thumbs down."

An engagement letter was entered between Trachte and Alpha on Monday, August 13, 2007. (Revised Alpha Engagement Letter, dkt. # 586–11, at 1.) Mastrangelo signed the letter on behalf of Trachte; and Maier and Alpha's managing director signed on behalf of Alpha. Mastrangelo understood he had hired Alpha, and more specifically Maier, in his role as a trustee of the to-be-formed ESOP, just as he had hired Barnes Wendling and RSM McGladrey. The engagement was made with the knowledge of the existing Trachte board members, including Pagelow and Fenkell, although the board's approval was not formally sought.

At the time the engagement letter was signed, Alpha had not received a copy of the ESOP plan document, which was not formally adopted until August 24, 2007. The engagement letter provided:

> [Trachte] has independently determined that the retention of [Alpha] by

---

11. Maier had previously served as president of Wells Fargo Retirement Plan Services and before that of Emjay Corp., the latter of which acted as trustee for 3,000 retirement plans with over a billion dollars in assets. However, Maier had primarily served as a third-party administrator and custodian and his fiduciary responsibilities were limited to reviewing investment options for retirement accounts and screening investment managers. Maier also had been a directed trustee in over a hundred ESOP transactions. Maier's most comparable experience—and it was on but one occasion—was acting as an independent fiduciary with respect to the *termination* of an ESOP.

12. At her deposition, Klute expressed the belief that Alpha was hired by the board, although she was unable to identify who were members of the board at the time of Alpha's initial engagement.

[Trachte] satisfies, if applicable, all requirements of section 404(a)($l$) of the Employment Retirement Income Security Act of 1974 ("ERISA"), and will not be prohibited under any of the provisions of section 406 of ERISA or section 4975(c)($l$) of the Internal Revenue Code of 1986, as amended.

(*Id.* at 1.) Neither Seefeldt, Mastrangelo nor Klute reviewed the plan to determine whether Alpha was properly appointed, believing they had no duty to do so. Anderson never advised the trustees explicitly, either in writing or orally, that Alpha had been properly appointed and had the authority to direct the trustees. Nevertheless, Anderson in fact held this belief, as ultimately did the putative trustees, and Anderson's actions implied that Alpha was properly appointed as a directing trustee.

### 2. The scope of Alpha's engagement

Alpha's engagement letter states that it will provide "certain financial analysis, consulting and other independent fiduciary services" for the Trachte ESOP, the scope of which were "identifie[d]" by Schedule A. (*Id.* at § 1.) As originally executed, Schedule A provided in whole:

> Consultant will review the proposed leverage buyout by the [Trachte ESOP] within the context of plan documents and plan operations in order to determine whether purchase of company stock by the ESOP from the [Alliance ESOP] is appropriate under the circumstances and in the best interests of the plan participants. If Consultant concludes that such investment is appropriate, Consultant will then direct the Trustees of the ESOP to execute the transaction and will take such other steps as are reasonably required by Client to facilitate the proposed investment.

(Joint Ex. 24, Original Alpha Engagement Letter, dkt. # 586–10, p. 5.) Sometime af-

ter the signing of the engagement letter on August 13, 2007, the final sentence of Schedule A was modified to add the bolded terms:

> If Consultant concludes that such investment is appropriate, **and that the purchase price is for no more than adequate consideration,** Consultant will then direct the Trustees of the ESOP to execute the transaction and will take such other steps as are reasonably required by Client to facilitate the proposed investment.

(Revised Alpha Engagement Letter, dkt. # 586–11, p. 5.) The letter further provides that Alpha "will be a fiduciary with respect to the ESOP and will be subject to the duties imposed on a fiduciary by the Employee Retirement Security Act of 1976," but it does not explain the nature of its fiduciary role. Maier did not consult an attorney about his duties under the contract or under ERISA generally.

At the time of the engagement, Maier and Mastrangelo understood that Alpha would have no role in negotiating or shaping the terms of the transaction. They believed Alpha's role was to review the entire 2007 transaction as the trustees had negotiated it, analyze the reports from their various advisors, advise the trustees whether the transaction was in the best interests of the ESOP participants and then direct the trustees whether or not to proceed with the transaction.

Although Alpha was reviewing the work of the other service providers, including SRR and Barnes Wendling, they understood that Alpha was not redoing their work and would rely on the information received from the trustees and from other service providers. In particular, both parties to the engagement letter understood that Alpha would not be making its own appraisal of Trachte's value. Accordingly, under ¶ 8, the engagement letter provides:

The Client recognizes and confirms that Consultant: (a) will use and rely on the Information and on other information available from generally recognized sources in performing the services contemplated by this letter without any obligation to independently verify the Information or such other information; (b) will not assume responsibility for the accuracy or completeness of the Information or such other information; and (c) will not make an appraisal of any of the tangible assets or liabilities of the Client or any other entity. Notwithstanding that Consultant may present analysis and evaluations of reported financial results and other data, Consultant does not thereby forecast, project, guarantee or otherwise make any representations as to future performance.

(*Id.* ¶ 1.)

The letter also imposes on the trustees an obligation to provide Alpha with information:

The Client will furnish all information reasonably requested by Consultant for the purpose of rendering services hereunder (the "Information") and will direct the current Trustee (as well as other fiduciaries and service providers) to provide Consultant such information as may be in its possession or control. To the best of the Client's knowledge, the Information will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained in the Information not misleading.

(*Id.*)

### 3. Alpha's work

While the letter of engagement was being finalized, Maier looked up information about ESOP transactions and performed internet searches to find background information about Trachte, the Alliance ESOP, the two valuation firms and the individuals involved. By the time Alpha was hired officially on August 13, 2007, the scheduled closing date was August 20, 2007. Maier received the first documents on August 13, including the draft ESOP plan document, a draft of the master closing memorandum, SRR's annual valuations from 2006 and 2005, a draft of the SRR take down letters and a draft of the Barnes Wendling fairness opinion. These documents included financial information about Trachte through June 30, 3007. On August 16, 2007, Maier sent Mastrangelo and Seefeldt a draft letter of direction, which they believed was an indication of his initial approval.

From reading the draft fairness opinion and valuation, Maier knew SRR and Barnes Wendling were relying on management's forecasts and believed he had an obligation to verify the reasonableness of those projections independently. To do so, Maier compared the projections in the valuation reports to past performance over the last five years, interviewed Mastrangelo and Seefeldt and had a 15–minute conversation with the investment banker Kindstrom from Chase. Before each interview, Maier developed a list of questions and generally maintained written notes of the interviews themselves. Among other things, those notes indicate Seefeldt informed Maier that steel prices were up, the 2007 revenue was 13% below budget, and the market was mature and experiencing less growth. Among others, Maier also interviewed Aumiller from Barnes Wendling for between 15 and 30 minutes, but kept no notes of that conversation or about the Barnes Wending fairness letter. His direction letter also does not list this conversation as information on which he relied.[13]

---

**13.** Maier remembers having Aumiller take him through each step in her letter, although

#### 4. Alpha's reliance on SRR.

After receiving the transaction documents, Maier realized that SRR was hired not by the Trachte ESOP, but by the Alliance ESOP. It initially concerned him that another party to the transaction was providing the valuation that the Trachte ESOP would rely upon, instead of the buyer obtaining its own valuation of the stock it was purchasing. After reviewing a draft of the Barnes Wending fairness opinion, Maier concluded that standing alone it would not meet the standards for a valuation report (he was using proposed Department of Labor regulations for guidance), as he understood the Barnes Wendling opinion was not intended to be an opinion of fair market value and instead was relying on the SRR valuation. Accordingly, Maier explained to Mastrangelo that the Barnes fairness opinion was not sufficient; he needed a full valuation report, including an opinion of Trachte's fair market value.

On August 16, 2007, Mastrangelo sent Wanko an email stating that Alpha was insisting on seeing a full valuation report from SRR. In a reply sent the next day, Wanko reminded them that SRR was engaged by the Alliance ESOP and that Alpha must rely on the fairness opinion from Barnes Wendling because "SRR was not providing an opinion of value for the new Trachte ESOP." He also forwarded Mastrangelo's email to Gould at SRR and asked her to call Mastrangelo. Later that day, Wanko told Mastrangelo that SRR had agreed to allow Alpha to see its opinion letters, but not to rely on them.

When Maier did not receive the SRR valuation, he followed up with Alliance. After some back and forth, Maier had a conversation with Fenkell and Wanko about the SRR valuation report. He told them that he could not move forward unless he saw the full valuation performed by SRR. During that conversation, neither Fenkell nor Wanko told Maier he would not be permitted to rely on the SRR report.[14]

In an August 20 email to Fenkell and Wanko, Gould advised Alliance that SRR would not allow Alpha to rely on the opinion without a side letter, which would state that SRR had been hired by the Alliance ESOP and the fiduciaries of the Trachte ESOP could not assume SRR was independent as to the Trachte ESOP.[15]

On August 20, without obtaining the side letter, Wanko forwarded the 2006 SRR valuation report to Maier. Maier then forwarded the report to Aumiller at Barnes Wendling, as he believed part of his role was to keep the other advisors informed. Later, Maier noticed the 2006 valuation report was missing certain schedules related to Trachte, so he followed up with Alliance to obtain those schedules and forwarded them to Aumiller as well. After receiving the annual valuation, Maier checked it against a list he had developed for evaluating ESOP appraisals to determine whether they considered the right elements, followed the rules for de-

---

he cannot remember any specifics from the conversation (e.g., treatment of the tax shield). Maier had some understanding that there was some uncertainty about the use of tax shields in appraisals, but did not perform any research to determine whether it was appropriate for this transaction. At her deposition, Aumiller could not remember any conversation of substance with Maier, though at trial she remembered having conversations with him, just not any details.

14. Fenkell denies speaking to Maier, even though Maier referenced the conversation with Fenkell in a contemporaneous email.

15. A draft letter to that effect was written by SRR, but was never finalized or sent to anyone outside SRR. No side letter was ever executed.

termining adequate consideration and mentioned those in the report. Maier never spoke with anyone at SRR.

Maier's direction ultimately rested on the narrative from SRR's 2006 annual valuation and the conclusions from the takedown letters. Those letters do not explain how SRR updated its information or analysis, if at all, between December 2006 and August 2007.

### 5. Alpha's limited information

Maier diligently reviewed all of the transaction documents that he received. Although the expected closing date at the time of his engagement left him only a week for his analysis, the closing date was moved back several times, permitting him adequate time for his analysis. Even so, Maier's analysis lacked significant pieces of information, including:

- Maier never requested, nor was he given, information about the other proposals, although he was informed early on that Alliance had marketed Trachte for sale to third parties. Accordingly, he never learned that HIG had engaged in extensive due diligence and then withdrawn from the deal, nor did he learn about HIG's concerns about Trachte's projected revenue or conditions in the larger self-storage market.
- Maier never learned about disagreements within Trachte. He was never told that other members of Trachte's management raised concerns about sales and the storage market, or about the town hall meeting with Trachte employees.
- Maier was never told about the engagement of RSM McGladrey or Walter Smith.
- Maier never requested, nor received, various documents relied upon by Barnes Wendling (although listed in its fairness opinion), including management's updated financial projections, Trachte's income tax returns and the April 19 Letter of Intent.
- Maier performed no analysis of the value of Store–N–Save, although he knew that the 2007 transaction included Trachte's 60% interest in Store–N–Save.
- Maier performed no analysis to determine whether Trachte could afford the debt it was incurring, and his only investigation into Trachte's ability to meet these cash flow requirements was a 15 minute call to Chase.

Even with the limited information he did have, Maier recognized that the transaction posed significant risk for participants with large accounts in the Alliance ESOP, but also believed the value of Trachte would exceed the consideration paid by the ESOP within five years. He, therefore, concluded that the potential gain was worth the risk and so advised Mastrangelo, Seefeldt and Klute.

### H. Preparations for the 2007 Transaction

Although Trachte's board of directors typically met quarterly, no board meetings were called between February and August of 2007. At the February 2007 board meeting, the Trachte board consisted of Pagelow, Fenkell, Wanko, Lynn and one independent trustee, Rolf Killingstad. (Smith, the other independent member, resigned in September 2001.) When Alliance informed the board of its decision to sell Trachte to HIG at the February 2007 meeting, Killingstad voted against the sale, not wanting Trachte to lose control over the company, nor Trachte employees to lose the diversification provided by the Alliance ESOP.[16]

The independent Trachte board of directors were never officially asked to review the actions of management in propos-

---

**16.** Killingstad never received word that he was officially removed from the board after this meeting, nor did he officially resign. Nevertheless, while he continued to receive

ing or negotiating the 2007 Transaction. Instead, on August 22, 2007, Fenkell, on behalf of AHI, and Pagelow, on his own behalf, executed a written consent of the shareholders to remove all existing board members and appoint Seefeldt and Mastrangelo as the sole directors of the Trachte board. (Joint Ex. 26, dkt. # 586–12.) The written consent also gave Fenkell and Wanko rights to act as "board observers, without voting rights," but with the right to attend and participate in all board meetings.[17]

On August 24, 2007, Seefeldt and Mastrangelo, acting as Trachte's new board of directors, took the following actions by written consent:

1) adopted the Trachte ESOP, effective as of August 1, 2007;

2) appointed Seefeldt, Mastrangelo and Klute as the initial trustees of the Trachte ESOP, effective as of August 1, 2007;

3) ratified and approved the engagement of Alpha Consulting Group; and,

4) decided to continue the Trachte Phantom Stock Plan, amend it to comply with Section 409A of the IRC and not make any payments to participants in connection with the purchase of Trachte by the Trachte ESOP.

(Joint Ex. 27, dkt. # 586–13.)

On August 29, 2007, Alpha issued a letter to the trustees of the Trachte ESOP. (Joint Ex. 28, dkt. # 586–14.) After listing the various materials upon which Alpha relied, including the SRR annual valuation, SRR take down letters and the Barnes Wendling fairness opinion, Alpha concludes that

> "[T]he proposed transaction which results in [Trachte] being wholly owned by the [Trachte] ESOP, is in the best interest of the [Trachte] ESOP and the ESOP plan participants and ... the price at which the ESOP intends to purchase [Trachte] stock represents no more than adequate consideration. Alpha therefore directs the [Trachte] ESOP trustees to complete the transaction."

(Id. at 2.)

The trustees choose to follow this direction and authorized the 2007 Transaction. Seefeldt did not ask Alpha what analysis it had performed and believed that the trustees were required to follow Alpha's direction unless the direction was illegal. Mastrangelo also believed that the trustees were required to follow Alpha's direction, but retained the ultimate authority to decide whether to enter the transaction. He did not consider under what circumstances the trustees could disregard Alpha's instruction. Klute was not aware she had any obligation to evaluate Alpha's direction, believing she could not disregard Alpha's direction under any circumstances.[18]

---

the financial statements circulated to the board, Killingstad assumed he had been removed from the board because he was not called to another board meeting or consulted about the management buyout.

**17.** Based on submissions at summary judgment, Pagelow also apparently gave Alliance an irrevocable proxy to remove the new board and reappoint the old board in case the 2007 Transaction fell through.

**18.** Klute believed the board had appointed Alpha but did not know what document delineated the respective duties of Alpha and the trustees and did not ask about them. She did not know what materials Alpha used for its analysis, did not speak with anyone from Alpha prior to the closing, or ask Maier any questions about the work he had performed that day. She was not familiar with the terms "prohibited transaction" or "adequate consideration," and did not ask anyone what the terms meant in Alpha's direction letter. Prior

## I. The 2007 Transaction

The sale of Trachte closed on August 29, 2007. Before the transaction, Alliance held 2,707 common shares and 20,000 preferred shares of Trachte stock and Pagelow held 506 common shares. The accounts of the Trachte employees in the Alliance ESOP consisted of: (1) 306,428.3758 common shares of AH Transition; (2) 32,449.1342 common shares of Alliance; and (3) $178,390.79 in cash. After the transaction, the Trachte employees were members of the Trachte ESOP, their accounts held only Trachte common stock and their accounts comprised 100% of Trachte's equity.

The detailed terms of the 2007 Transaction are set forth in the closing binder and summarized in the closing memorandum. (Joint Ex. 33, dkt. # 587–4, 587–5.) The transaction consisted of eleven steps, most of which involved executing multiple documents. As a formal matter, each step occurred sequentially. However, each step was conditioned on the completion of all previous and subsequent steps. The closing memorandum provided that "the obligation of the parties to consummate each transaction is conditioned upon the consummation of all the transactions and receipt of the fairness opinion described above." (Id., General Provisions, § 2, at 4.) All parties understood and agreed that, if any of the steps did not occur, then the transaction as a whole would be unwound, previous steps reversed and the parties returned to their original position with Alliance back in control of Trachte. In that event, no formal penalty or fee would be imposed on the party who walked away.

For practical purposes, the steps may be grouped into three moments. In steps 1 through 3, the accounts of Trachte employees in the Alliance ESOP were spun-off into the Trachte ESOP and the shares of Alliance in their accounts were exchanged for shares of Trachte held by AHI.

1) The Trachte ESOP purchased from AHI 568.5428 common shares of Trachte for a promissory note of $7,803,534 (Stock Purchase Agreement, dkt. # 587–4, at 93–105), an amount equal to the value of the Alliance and AH Transition shares allocated to Trachte employees' accounts in the Alliance ESOP, as determined by the SRR take down letters. The note provided that payment was due on the date the note was executed and, in lieu of funds, was payable in shares of Alliance and AH Transition stock. AHI then assigned 92.87% of the promissory note from the Trachte ESOP to AH Transition, and 7.13% to Alliance (id. at 106, 107) and the Trachte ESOP executed two replacement promissory notes (id. at 108, 109).

2) The Alliance ESOP spun-off the accounts of the Trachte employee participants to the Trachte ESOP. Acting as the plan administrator, Alliance adopted the instrument that amended the Alliance ESOP plan and directed the trustee of the Alliance ESOP to spin-off the accounts. Fenkell executed these documents on behalf of Alliance as its sole director. (Instrument Providing for Amendment and Spin-off, dkt. # 587–4, at 112–115; Action of Director in Writing, dkt. # 587–4, at 119.) Then, acting as the sole trustee of the Alliance ESOP, Fen-

---

to the closing date, she had not reviewed the closing documents and was not familiar with their terms. She had reviewed the letters from SRR, Barnes Wendling and RSM McGladrey, but had no questions about their methods or conclusions, and played no role in hiring SRR or Barnes Wendling, did not know how they were chosen and had no basis to form an opinion about their qualifications.

kell executed the document assigning 32,449.1342 shares of Alliance common stock and 306,428.3758 shares of AH Transition common stock to the Trachte ESOP. (Dkt. # 587–4, at 116, 117.). These shares were accepted by the trustees of the Trachte ESOP, Seefeldt, Mastrangelo and Klute. (*Id.*)

3) The Trachte ESOP repaid the promissory notes by transferring the Alliance and AH Transition stock allocated to its participants' accounts to Alliance and AH Transition, in proportion to the promissory notes. (Assignments, dkt. # 587–4, at 133, 134; Receipts, dkt. # 587–4, at 134, 135.)

Next, in steps 4 through 7, Trachte took out a bank loan and recalled funds previously loaned to Store–N–Save, using some of these proceeds to repay existing debt and loaning most of the remaining funds to the Trachte ESOP.

4) Trachte borrowed $27.5 million from Chase to repay existing indebtedness and to fund transactions (Credit and Term Loan Agreement between Trachte and Chase, dkt. ## 588, 589).

5) Trachte repaid employee notes and specified expenses totaling $795,667.

6) Store–N–Save, the majority-owned (60%) subsidiary of Trachte, repaid $2,254,125.06 that it owed to Trachte, using funds from the refinancing of its loans.

7) Trachte loaned $26,677,523.00 to the Trachte ESOP, to fund the ESOP's purchase of Trachte stock described in Step 11 below. (ESOP Loan and Pledge Agreement, dkt. # 587–4, at 138–155, dkt. # 587–5, at 2–3.)

Finally, in steps 8 through 11, Trachte and the Trachte ESOP redeemed or purchased all the outstanding Trachte preferred and common equity held by Pagelow, Alliance and Alliance employees.

8) Trachte terminated the Trachte Phantom Stock Plan for Alliance Employees with a cash payment of $4,905,300 to its participants, all employees of Alliance Holdings. Fenkell received approximately $2.9 million as part of the phantom stock plan.[19]

9) Trachte redeemed all of its outstanding preferred equity and some of its common equity:

 a. Trachte redeemed 20,000 preferred shares (equivalent to $2 million) and 573.7976 common shares of Trachte held by AHI in exchange for a subordinated promissory note of $4,370,000. (Stock Redemption Agreement, dkt. # 587–5, at 5–30.) The note had a seven-year term with an initial interest rate of 8 percent through February 28, 2010, after which a 13 percent interest rate applied. The note was subordinated to the debt owed by Trachte to Chase.

 b. Trachte redeemed 92.5360 common shares held by Pagelow in exchange for a subordinated promissory note of $1,300,000. (Stock Redemption Agreement, dkt. # 587–5, at 31–52.) The note had a seven-year term with an initial interest rate of 8 percent through February 28, 2010, after which a 13 percent interest rate applied. The note was subordinated to the debt owed by Trachte to Chase.

10) Alliance redeemed 27,592.5453 shares of Alliance common stock held by Trachte by transferring to Trachte

---

**19.** Although the price of the phantom stock was supposed to be tied to the price of Trachte shares, it appears the price of phantom stock payments inexplicably increased $300 from the April 19 letter of intent, while the price of Trachte's shares decreased.

34.4769 shares of Trachte common stock. (Stock Purchase Agreement, dkt. # 587–5, at 54–68.)

11) The Trachte ESOP purchased all outstanding common equity.

 a. The Trachte ESOP purchased the remaining 1,530.1827 of outstanding common shares of Trachte held by AHI, for a cash purchase price of $21,002,523. (Stock Purchase Agreement, dkt. # 587–5, at 70–79.)

 b. The Trachte ESOP purchased the remaining 413.464 of outstanding common shares of Trachte held by Pagelow, for a cash purchase price of $5,675,000. (Stock Purchase Agreement, dkt. # 587–5, at 81–89.)

At the completion of the 2007 Transaction, The Trachte ESOP owned all out- standing shares of Trachte stock. Fire Facilities and Trac–Rite Door remained wholly-owned by Trachte, and Store–N– Save remained owned 60% by Trachte and 40% by Stephen Pagelow (and continued as such until it was sold in 2010). Trachte and the Trachte ESOP paid $45 million in consideration for Trachte's total equity and around $38.1 million for its common equity ($34.48 million in cash and $3.67 million in promissory notes). Trachte re- tained $4.978 million in cash, the amount exceeding $4.5 million on its balance sheet. Trachte owed $27.5 million in bank notes, $5.67 million in seller's notes, and some- where between $1.9 and $2.9 million in liabilities under the phantom stock plan for Trachte employees, for a total debt be- tween $35.07 and $36.07 million.

**The 2007 Transaction**

## J. Trachte's Performance After the 2007 Transaction

Stephen Pagelow was re-elected to Trachte's board of directors on September 24, 2007. For the calendar year ending in 2007, Trachte's total sales were reported as $70,951,000 and it achieved an EBITDA of $7.76 million. Its debt to EBITDA

ratio was 3.56, within the 4.5 ratio required by its loan covenants. The valuation as of December 31, 2007, valued Trachte at $16.99 million, considering its debt load.

By May 2008, less than six months later, Trachte was projecting it would not meet its loan covenants. By the fourth quarter of 2008, Trachte was out of compliance with its loan covenants and fell short of met its EBITDA ratios. As of December 31, 2008, the valuation of Trachte stock placed its value at $0. By the first quarter of 2009, Trachte was no longer current with its loan repayment schedule.

## OPINION

### A. Trustee Defendants

Plaintiffs maintain that the trustee defendants, Seefeldt, Mastrangelo and Klute, (1) breached their general fiduciary duties under ERISA § 404(a), (2) caused a prohibited transaction under ERISA § 406(a), and (3) are liable for failing to monitor one another and Alpha under ERISA § 404(a) and are liable as co-fiduciaries for one another and Alpha's breaches under ERISA § 405(a).

### 1. ERISA Fiduciaries and Fiduciary Duties under § 404(a)(1)

■ "In order to prevail on a claim for breach of fiduciary duty under ERISA, a plaintiff must prove (1) that defendants are plan fiduciaries; (2) that defendants breached their fiduciary duties; and (3) that their breach caused harm to the plaintiffs." *Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir.2007).

According to ERISA's definition of a fiduciary,

a person is a fiduciary with respect to a plan to the extent

he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 405(c)(1)(B).

29 U.S.C. § 1002(21)(A).

■ Under this definition, "fiduciary" is defined "not in terms of formal trusteeship, but in functional terms of control and authority over the plan." *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). A person is a fiduciary if he "exercises any power of control, management or disposition with respect to monies or other property of an employee benefit fund, or has the authority or responsibility to do so." *Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir.1989) (quoting H.R.Rep. No. 533, 93rd Cong., 2d Sess. 11, *reprinted* in 1974 U.S.C.C.A.N. 4639, 4649). Accordingly, the extent of a trustee's fiduciary duties under ERISA may be determined by her authority under the plan, as well as by her actual exercise of control over plan assets.

■ Although the term fiduciary used in ERISA should receive a liberal construction to accommodate the statute's remedial purpose, these fiduciary obligations are not unlimited. *Id.* A person is a fiduciary only "to the extent" that she is exercising discretionary authority or control. 29 U.S.C. § 1002(21)(A); *Beach v. Commonwealth Edison Co.*, 382 F.3d 656, 658 (7th Cir.2004). To assess the scope of a person's fiduciary obligations, "a court must ask whether that person is a fiduciary with respect to the particular activity at issue." *Plumb v. Fluid Pump Serv.*, 124

F.3d 849, 854 (7th Cir.1997) (quotations omitted). Not all decisions that affect plan assets fall within the scope of a fiduciary's obligations. Employers who sponsor ESOPs wear "two hats," acting as a fiduciary to the extent that they administer or manage the plan and as an employer to the extent they engage in settlor functions such as establishing, funding, amending or terminating the trust. *Pegram v. Herdrich*, 530 U.S. 211, 225–27, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Moreover, for a person to be a "functional fiduciary" based on *de facto* control over an administrative decision by the plan, she must do more than "play some role" in the decision; she must exercise "final authority" over the decision. *Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir.2009).

ERISA fiduciaries owe a duty of loyalty and a duty of care, which are codified in the "prudent man standard of care" of ERISA § 404(a)(1). An ERISA fiduciary must

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> * * *
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> * * *
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

29 U.S.C. § 1104(a)(1).

■ An ERISA "fiduciary must act as though he were a reasonably prudent businessperson with the interests of all the beneficiaries at heart." *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir.2006). The fiduciary duties under ERISA are "the highest known to law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir.1982).

■ The duty of loyalty under § 404(a)(1)(A) requires ERISA fiduciaries to act "with an eye single to the interests of the participants and beneficiaries." *Id.* at 271. Where a situation poses "substantial conflicts of interest," the duty of loyalty may require a fiduciary to avoid placing themselves in that situation. *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir.1984). "Where it might be possible to question the fiduciaries' loyalty, they are obligated at a minimum to engage in an intensive and scrupulous independent investigation of their options to ensure that they act in the best interests of the plan beneficiaries." *Id.*

■ The duty of care § 404(a)(1)(B) requires ERISA fiduciaries to act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act. *Eyler v. C.I.R.*, 88 F.3d 445, 454 (7th Cir.1996). "An ESOP fiduciary is required to act with the care, skill, and diligence that a prudent person would undertake in a like capacity, with the same degree of familiarity with the facts, and with similar aims." *Id.* The duty of care includes a duty to perform adequate investigation, which is satisfied only if, "at the time they engaged in the challenged transactions, [the fiduciaries] employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Id.* (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984)).

■ When trustees lack the requisite knowledge, experience and expertise to assess the prudence of an investment, the duty of care may require them to hire

independent professional advisors. *Katsaros*, 744 F.2d at 279. Employing a financial advisor is evidence of adequate investigation, but reliance on experts is not a shield—it is "but a single factor to be weighed in determining whether a fiduciary has breached her duty." *Eyler*, 88 F.3d at 456 (*citing Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir.1983)). The fiduciary must still evaluate the advice given and "exercise his own judgment" about the transaction. *Jenkins*, 444 F.3d at 927–28. The fiduciary must make "an independent inquiry," *id.*, requiring him to "investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636–37 (7th Cir. 2005) (quoting *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir.1996) (trustees breached fiduciary duty by relying on independent evaluation with questioning valuation, when cursory review revealed its carelessness)). For a trustee to "exercise his own judgment," he must have at least some knowledge about the basis of the expert's opinion. *See, e.g., Eyler*, 88 F.3d at 453–56; *Reich v. Hall Holding Co., Inc.*, 990 F.Supp. 955, 963–66 (N.D.Ohio 1998); *Andrade v. Parsons Corp.*, No. CV 85–3344–RJK, 0090 WL 757367, at *7–11 (C.D.Cal. June 21, 1990).

### 2. Fiduciary Status of the Trustee Defendants

According to the default rule set out in ERISA § 403(a)(1), plan trustees "have exclusive authority and discretion to manage and control the assets of the plan." 29 U.S.C. § 1103(a)(1). Such "discretionary trustees" are plan fiduciaries with the full duties of loyalty and care for these purposes. However, ERISA permits a plan document to limit a trustee's fiduciary obligations by making them "directed trustees." Whether a trustee is a directed or discretionary is determined by the express provisions of the plan document. Under ERISA § 403(a)(1), if "the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee" then "the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to [ERISA]." 29 U.S.C. § 1103(a)(1).

Directed trustees remain subject to the fiduciary duties articulated in ERISA § 404(a)(1), because this provision applies to "a fiduciary" without restriction. However, the duty of care is tempered to accommodate the statutory imperative that directed trustees "shall be subject" to proper directions from a named fiduciary. *Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 406 (7th Cir.2006); *Chesemore v. Alliance Holdings, Inc.*, 770 F.Supp.2d 950, 969 (W.D.Wis.2011). A directed trustee is not required to engage in an independent investigation into the prudence of the transaction; however, the trustee can and must "disobey the named fiduciary's directions when it is plain that they are imprudent." *Summers*, 453 F.3d at 406–07. Accordingly, a directed trustee breeches her fiduciary duties with respect to a directed action only if she knew or should have known that a direction was (1) contrary to the plan, (2) contrary to ERISA or (3) plainly imprudent. *Id.*

With respect to decisions about plan investments, the Trustee Defendants were directed trustees. As this court ruled in its opinion on their motion to dismiss, the plan document provides that the trustees may invest in employer stock or incur debt to purchase employer stock solely only at the direction of the Administrator. *Chesemore*, 770 F.Supp.2d at 969 (interpreting Trachte ESOP plan, Joint Ex. 2, dkt. # 583–2, at §§ 6.2, 7.1(b)). The Adminis-

trator was Trachte or its 'Affiliate Employers.' *Id.* at § 7.2. Defendants Klute, Mastrangelo and Seefeldt were directed trustees of the Trachte ESOP, because the plan documents provide that the trustees are subject to directions from Trachte regarding any investments in Trachte securities.

### 3. Breach of Fiduciary Duty Under § 404(a)(1)(D)

As Administrator and named fiduciary of the Trachte ESOP, Trachte never issued a direction to the trustees to enter the 2007 Transaction. Nevertheless, the trustees caused the Trachte ESOP to exchange all shares of Alliance Holdings, Inc. in its members' accounts for Trachte shares and caused the Trachte ESOP to borrow against the value of the Trachte shares in the Trachte ESOP to repurchase all the remaining Trachte shares from AHI and Pagelow.

 While it is true that Alpha purported to issue a letter "directing" the trustees to enter the transaction and that the Trustee Defendants chose to follow this direction, Alpha was not a proper "director" under the terms of the Trachte ESOP plan. Trachte did not appoint Alpha as the Administrator or named fiduciary under § 7.2. Alpha's engagement letter, which Trachte ratified, describes Alpha as "an independent fiduciary" and states that Alpha would "direct" the Trustee Defendants. However, the Trachte ESOP does not permit the Trustees to follow a direction from anyone but the Administrator, and the language of Alpha's contract cannot supersede the plan terms.

The Trustee Defendants argue that § 7.6(d) of the Trachte ESOP gives Trachte the power to appoint individuals to assist with plan administration. Section 7.6(d) provides that the Administrator shall "appoint and employ individuals to assist in the administration of the Plan and any other agents it deems advisable." Since Trachte did appoint Alpha in the letter, the Trustee Defendants maintain that Alpha was duly appointed Trachte's agent with authority to direct the trustees. Any such appointment would, however, have been improper. ERISA § 405(c)(1) provides that a plan instrument may allocate fiduciary responsibilities among named fiduciaries and other persons designated by named fiduciaries, but it also it provides that the plan may not allocate "trustee responsibilities," which it further defines as "any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan." 29 U.S.C. § 1105(c)(1), (3). Accordingly, § 7.6(d) of the Trachte ESOP does not supersede the specific language of § 6.2 allocating responsibility for the Administrator to direct the trustees and requiring the trustees to follow directions only from the Administrator. Because Alpha lacked authority to direct the trustees, the trustees invested funds and incurred debts in employer securities without proper direction.

Still, the Trustees honestly believed they were directed. Indeed, all of the Trachte and Alpha defendants seemed confused about the nature of their fiduciary duties in this transaction and even whether they were fiduciaries. Relying in part on advice from counsel when hiring Alpha, the trustees hired Alpha with the expectation that Alpha would issue a direction relieving them of their fiduciary duty to assess the transaction independently.[20]

The law is unclear about whether, and in what circumstances, good faith belief is a defense for a fiduciary's failure to follow

---

**20.** Apparently, their counsel believed that Alpha had the power to direct the trustees, but never expressly advised the trustees that they were entitled to follow Alpha's direction.

the plan terms. The language of § 404(a)(1)(D) does not include a *scienter* element. Consistent with the statute, courts often state that a person's fiduciary status under ERISA is determined by the plan terms and their objective conduct, not by their subjective beliefs. *Thomas, Head & Greisen Emps. Trust v. Buster,* 24 F.3d 1114, 1119 (9th Cir.1994); *Donovan v. Mercer,* 747 F.2d 304, 309 n. 4 (5th Cir. 1984); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 635 (W.D.Wis.1979). The Seventh Circuit has declared that "whether a person is a fiduciary is determined by an objective standard; it matters not that the person may subjectively believe that he or she is not a fiduciary." *Farm King Supply,* 884 F.2d at 291–92 (citations omitted).

This is, however, a different question than whether the fiduciary's *actions* establish they were exercising control over plan assets. The Seventh Circuit has observed that "trustees do not breach their fiduciary duties by interpreting the plan in good faith, even if their interpretation is later determined to be incorrect." *Challenger v. Local Union No. 1,* 619 F.2d 645, 649 (7th Cir.1980). Similarly, the Third Circuit has stated that a plaintiff must allege "willful or bad faith conduct" to establish liability for following a mistaken interpretation of a plan document. *Burke v. Latrobe Steel Co.,* 775 F.2d 88, 91–92 (3rd Cir.1985).

However, the Third Circuit has since limited the scope of its broad statements in *Burke. Leckey v. Stefano,* 501 F.3d 212 (3rd Cir.2007). In *Leckey,* the Third Circuit held that a trustee is not liable for mistakes made during the exercise of his valid authority under the plan unless he acts in bad faith or negligently, but "fault is not an element of the breach" when a fiduciary makes a "mistake in the extent of his powers, not in his exercise of them." *Id.* at 225 (citations omitted). The court

explained that this distinction was common to the law of trusts, which it was required to follow in ERISA cases in light of *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (ERISA standards should be "guided by principles of trust law"). The Restatement notes that a fault requirement is appropriate when the plan gives the administrator authority to interpret its terms, but not when the administrator is interpreting the scope of its authority, because the plan and the rules of law determine the administrator's authority, not the administrator's interpretation or belief about them. *The Restatement (Second) of Trusts,* § 201, cmt. B.

The Seventh Circuit's opinion in *Challenger* is consistent with this approach adopted by the Third Circuit in *Leckey.* In *Challenger,* the plaintiff alleged as the basis for his fiduciary duty claim that the defendant trustee misinterpreted the "break-in-service" provision of the plan, which the trustee had to interpret in order to decide the plaintiff's benefits claim. *Challenger,* 619 F.2d at 649–49. The court noted that "it is, of course, [the trustee's] duty to interpret the plan when passing on an applicant's claim requires them to do so. That duty is discharged when they make a good faith interpretation and act accordingly." *Id.*

In contrast, the mistake by the Trachte ESOP trustees concerned the *extent* of their authority. The trustees believed incorrectly that Trachte had the power to appoint and had appointed Alpha to direct the investment of plan assets. This is not a case where the plan or ERISA give trustees the discretion to interpret the plan terms and, thus, not a situation where it is appropriate to conclude that the trustees discharged their obligation to follow the plan merely by acting in good faith.

Having said that, the court need not determine whether negligence or strict liability is the appropriate standard because plaintiffs have met their burden of proof, even if a breach for failure to follow the plan terms requires negligence. The trustees apparently did not read the trust document or form an independent judgment before following Alpha's direction. Instead, they relied on the representations from Trachte, Alpha and their attorney that Trachte had authority to hire Alpha. From these representations, the Trustee Defendants inferred that Alpha had the authority to direct them. They further argue that they were entitled to rely on these representations under § 7.1(d) of the Trachte ESOP, which provides in relevant part that:

> Each fiduciary warrants that any directions given ... shall be in accordance with provisions of the Plan or Trust ... authorizing or providing for such direction.... Furthermore, each fiduciary may rely upon any such direction ... of another fiduciary as being proper under the Plan or Trust, and is not required under this Plan or Trust to inquire into the propriety of any such direction.

Trachte ESOP, § 7.1(d).

This provision cannot relieve the Trustee Defendants of liability. First, the trustees were not entitled to and did not reasonably rely on the representations by Trachte or Alpha. Mastrangelo, Seefeldt and Klute set up the Trachte ESOP, and Mastrangelo and Seefeldt authorized the appointment of Alpha on behalf of Trachte. They cannot relieve themselves of their duty as trustees of the Trachte ESOP to follow the plan terms by issuing a directive in their role as directors of Trachte, relying on the representation in that directive that it follows the plan. Any reliance on representations by Alpha about the Trachte ESOP was equally misplaced, because the trustees were ultimately obligated to oversee Alpha's work and Alpha's

engagement letter expressly provided that Trachte was responsible for ensuring the appointment was consistent with the plan terms.

The trustees' most plausible defense is that they relied on advice of counsel. Their attorney advised them that Trachte could appoint Alpha and that the appointment would help satisfy their fiduciary obligations, but he never advised them expressly that they were authorized to follow a direction from Alpha. Like the good-faith defense, it is not clear whether fiduciaries may assert advice of counsel as a defense for a failure to follow plan terms. *Leckey,* 501 F.3d at 225. The Supreme Court has said that trust law principles should guide interpretation of ERISA, *Firestone Tire,* 489 U.S. at 110, 109 S.Ct. 948, and it quoted approvingly from the Restatement (Second) of Trusts § 201, cmt. B. That section denies that trustees may claim advice of counsel as a complete defense for a trustee's mistake about the extent of its powers:

> where [a trustee] interprets the trust instrument as authorizing him to do acts which the court determines he is not authorized by the instrument to do ... he is not protected from liability merely because he acts in good faith, nor is he protected merely because he relies upon the advice of counsel.... If he is in doubt as to the interpretation of the instrument, he can protect himself by obtaining instructions from the court.

*Restatement (Second) of Trusts* § 201 cmt. B. (emphasis added). In the circumstances of this case, the court concludes that the trustees could not reasonably have *inferred* from their attorney's conduct that they could blindly follow Alpha's direction.

Even if it was reasonable to proceed without clarification of their role, it was unreasonable for the trustees to rely on advice from Alpha given their own aware-

ness of how Maier and Alpha had been hampered from fulfilling the ERISA fiduciary obligations of a directing trustee. Once the trustees recognized—extremely late in the day—that they lacked the expertise to assess the 2007 Transaction, it was certainly prudent for them to hire an advisor. As reflected in their testimony and presentations to other Trachte employees during the transaction, Seefeldt and Klute did not have the training or a full understanding of the transaction or the valuation, including the effect that crippling debt would have on an independent Trachte to survive the likely downturn and, therefore, share value. Mastrangelo understood the likely effects and risks, but he also had the smallest stake in the transaction, as he had recently joined Trachte and had a relatively small account in the Alliance ESOP holdings that would be used to leverage the transaction, and had much to gain.

Indeed, thanks to the orchestration of Fenkell and Alliance in eliminating the only independent Trachte board member (and the more obvious choice for at least one of the trustee positions), all three trustees were conflicted. Certainly, the Trustee Defendants wanted Trachte to be independent because they thought it was better for Trachte, but they also saw clearly that it was better for them in particular because the only way this management team would survive was if they took control of Trachte. There was no way that any of those trustees would have remained at Trachte had they torpedoed Alliance's exit strategy. Little wonder then, that they became cheerleaders for leveraging the Alliance ESOP accounts in individual and group employee meetings. Moreover, the trustees did not merely appoint a financial advisor; they abdicated their decision to Alpha while negligently restricting Alpha's ability to investigate, evaluate and negotiate the transaction independent-

ly, even if it had been given sufficient time to do so.

Alpha was hired just seven days before the scheduled closing date. Alpha's contract limited its authority to assess the transaction by insisting that Alpha rely on the fairness opinion of Barnes Welding (who in turn had relied on the valuation opinion of Alliance's regular appraiser) and by relieving Alpha of any obligation to ensure that the facts it relied on were accurate. The Trustees knew that Alpha lacked relevant information, because they agreed to these limitations and, at times, withheld potentially relevant information. Moreover, Alpha was not permitted to participate in continuing negotiations about the final terms of the deal, but was instructed to render a simple up or down direction to the trustees.

Even if Trachte had appointed Alpha as Administrator, such a purported delegation would have been imprudent, and improper, given the time constraints and the contractual restrains on Alpha's authority and fiduciary obligations. 29 U.S.C. § 1110(a) ("Except as provided in sections 1105(b)(1) and 1105(d) of this title, any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."). It was unreasonable for the trustees to conclude that the engagement of Alpha subject to these restrictions was sufficient to transfer all of their fiduciary responsibilities with respect to the 2007 Transaction.

At bottom, the trustees lacked sufficient knowledge to fulfill their fiduciary duty of prudence *and* faced a serious conflict of interest. Moreover, the trustees failed to identify clearly who held discretionary authority and shared fiduciary responsibility between themselves and the Alpha defendants. This situation—with all the deci-

sionmakers pointing fingers at someone else—is precisely the type of ambiguity that an ERISA fiduciary should seek to avoid. Therefore, the trustees' negligent failure to follow the plan documents constituted a breach of their fiduciary duty under ERISA § 404(a)(1)(D).

#### 4. Prohibited Transaction Under § 406(a)(1)(A) and (D) (Count VII)

ERISA § 406(a)(1) prohibits a plan fiduciary from causing the plan to engage in certain transactions with a "party in interest." A fiduciary may not cause a plan to enter a transaction when "he knows or should know that such transaction constitutes a direct or indirect ... sale or exchange, or leasing, of any property between the plan and a party in interest," ERISA § 406(a)(1)(A) or "a transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," ERISA § 406(a)(1)(D). ERISA defines a "party in interest" to include fiduciaries of a plan, employers of plan participants, and direct or indirect owners of fifty percent or more of voting power or shares of a corporation. 29 U.S.C. § 1002(14).

■■ ERISA recognizes an exception to this prohibition for "the acquisition or sale by a plan of qualifying employer securities ... if such acquisition [or] sale ... is for adequate consideration." 29 U.S.C. § 1108(e)(1). When an employer's securities has no recognized market (as is the case for Trachte, Alliance and AH Transition), "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18)(B). The ERISA fiduciaries, in this case the trustees, have the burden of proving (1) "that the ESOP paid no more than fair market value for the asset," and (2) "that the fair market value was determined in good faith by the fiduciary." *Keach v. U.S. Trust Co.*, 419 F.3d 626,

636–37 (7th Cir.2005) (citing *Eyler*, 88 F.3d at 454–55). The standard of care for investigating the fair market value under § 408(e)(1) is similar to the objectively prudent investor standard under § 404(a)(1)(B). *Howard*, 100 F.3d 1484, 1489 (9th Cir.1996).

Trachte was the employer and sponsor of the Trachte ESOP, and AHI was a party in interest as the majority shareholder of Trachte. The Trachte ESOP exchanged shares of Alliance and AH Transition in the plaintiffs' accounts for shares of Trachte held by AHI. This exchange occurred in two steps: AHI gave the Trachte ESOP shares of Trachte stock in exchange for a promissory note due that day, which the Trachte ESOP was obligated to repay by giving AHI all of the Alliance and AH Transition stock in the accounts unless the trustees suddenly chose to back out in the minutes when it was actually in their power to unwind the entire transaction. Accordingly, the 2007 Transaction was a prohibited transaction. The Trachte ESOP trustees knew that the transaction involved a party in interest.

Moreover, the trustees caused the transaction; the transaction would not have occurred without their choice to accept Alliance's improper orchestration and Alpha's improper direction. Unlike the cases cited by the Trustee Defendants, this is not a case where the directed trustees could not have "caused" the transaction because they received a proper direction and were obligated by the plan and by ERISA to follow it. *See, e.g., Rogers v. Baxter Int'l Inc.*, 710 F.Supp.2d 722, 740 (N.D.Ill.2010) (a fiduciary obligated by ERISA § 403(c) to follow instructions from plan participants cannot be liable for losses caused by participants' choices); *Tullis v. UMB Bank, N.A.*, 640 F.Supp.2d 974, 982 (N.D.Ohio 2009) (same).

Finally, the trustees have not met their burden to demonstrate that the acquisition of Trachte was for adequate consideration under ERISA § 408(e)(1). Indeed, they have not only failed to establish that Trachte ESOP paid no more than fair market value, they have not proven a good faith investigation to determine Trachte's fair market value. On the contrary, the trustees performed inadequate investigation, because they believed they were acting only as directed trustees. They simply followed Alpha's putative direction letter, without attempting to assess its conclusions.

While Mastrangelo and Seefeldt approached RSM McGladrey and Walter Smith with questions about the transaction, even this limited investigation revealed several potential problems with SRR's assessments of value and Barnes Welding's fairness opinions relied on by Alpha. Having been hired for years by Alliance and for this transaction to provide a valuation for the Alliance ESOP, SRR was not independent with respect to the Trachte ESOP. The trustees knew this from their discussions with Wanko, and it was written in SRR's take-down letters. SRR's valuation history was suspect, because it was clearly out of line with Trachte's essentially flat EBITDA from year to year, this despite Trachte's substantial revenue growth. Moreover, SRR relied on management's projections from the fall of 2006, which the trustees knew were flawed. Finally, SRR did not apply a discount for lack of marketability of this closely-held company, despite the fact that there was no ready market for its sale and a private auction had just failed.[21]

Barnes Wendling's opinion inherited these mistakes by beginning with SRR's valuation and simply making adjustments. Barnes Wendling did not investigate the basis of SRR's valuations and did not even have SRR's full valuation report until Alpha supplied it on August 20. Barnes Wendling also mistakenly added back in the tax shield. The tax shield represented a special advantage for an ESOP purchaser and, for that reason, was inappropriate to consider when valuing Trachte's fair market value between a hypothetical willing buyer and seller on the open market. The trustees were notified about the tax shield, but simply accepted Aumiller's bald assertion that it was correct and did not approach Alpha about the issue. Finally, neither SRR's 2006 valuation, nor Barnes Wendling's fairness opinion, provided an estimate of Trachte's necessary operating capital in light of its historic needs, assuming incorrectly that Trachte needed no operating cash in addition to the amount necessary to cover its unfunded customer deposits.

The trustees were aware of these facts and flaws in both the SRR valuation and the Barnes Wendling fairness opinion. They chose not to share their concerns with Alpha, so that Alpha and they could assess the transaction together. Instead, the trustees withheld their own concerns and blindly accepted Alpha's conclusions without seeking an explanation for the discrepancies, as an objectively prudent fiduciary should and would have done. *Howard,* 100 F.3d at 1489.

In addition, as a result of these mistakes, the transaction proceeded with a 2007 sale of Trachte for more than fair market value. The valuation by Barnes Welding placed the transaction on the very high end of arguable value: the top of the range was $40.1 million and the consideration for Trachte's equity was $38.32. This valuation relied on projections that were inflated, failed to include any dis-

---

21. For valuation purposes, it was plainly not sufficient to apply the discount only to the Alliance stock, because SRR was valuing Trachte as an independent concern.

count for a lack of marketability, underestimated Trachte's operating cash needs and included incorrectly the $1.9 million tax shield. At this point, the court is comfortable in concluding that the Trachte ESOP paid over fair market value for Trachte, though it is unable to determine the precise amount of that overpayment and will reserve judgment on the amount of the overpayment until completion of the damages trial.

For now, the court finds only that the Trustee Defendants have not met their burden to establish that (1) the Trachte ESOP paid no more than fair market value or (2) they determined fair market value in good faith. Accordingly, they have not met the exception under ERISA § 408(e)(1), and the Trustee Defendants are liable for causing Trachte to enter a prohibited transaction under ERISA § 404(a)(1)(A) & (D).

**5. Co-fiduciary Liability for Breach by Alpha (Count XII)**

■■■ Under ERISA § 404(a), an individual with discretion to appoint an ERISA fiduciary has a fiduciary duty to select, retain and monitor those whom they appoint as would a reasonably prudent businessperson. *Leigh,* 727 F.2d at 135; *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1465–66 (4th Cir.1996); *Howell v. Motorola, Inc.,* 337 F.Supp.2d 1079, 1097–99 (N.D.Ill.2004). In *Leigh,* the Seventh Circuit held that a fiduciary who was "responsible for selecting and retaining their close business associates as plan administrators ... had a duty to monitor appropriately the administrators' actions." 727 F.2d at 135 (citing 29 U.S.C. §§ 1104(a)(1), 1105(a), 1105(c); *Restatement (Second) of Trusts* §§ 184, 224 (1959)). In *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.,* 805 F.2d 732 (7th Cir.1986), the Seventh Circuit explained that corporate entities "may well have some duty to monitor" appointed plan administrators,

even when the administrators are not close business associates. *Id.* at 736. The Department of Labor has stated that

> [a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

ERISA Interpretive Bulletin 75–8, 29 C.F.R. § 2509.75–8 at FR–17.

In addition to liability for their own failure to monitor, ERISA § 405(a) makes a fiduciary liable for breaches by other fiduciaries "with respect to the same plan" in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

■■■ Section 405(c)(1) authorizes plan documents to permit fiduciaries to limit their liability for the breaches of their co-fiduciaries by allocating specific responsibilities among the fiduciaries. 11 U.S.C. § 1105(c)(1). Even a proper delegation of authority, however, does not remove entirely the delegating fiduciary's duties. The delegating fiduciary remains liable if the allocation or retention of the delega-

tion violates § 404(a)(1) or if the delegating fiduciary meets any of the requirements in § 405(a). 29 U.S.C. § 1105(c)(2); *Free v. Briody,* 732 F.2d 1331, 1335–36 (7th Cir.1984). A delegating fiduciary who knows of a breach by the delegated fiduciary cannot "escape liability by simply casting a blind eye toward the breach." *Willett v. Blue Cross & Blue Shield,* 953 F.2d 1335, 1341 (11th Cir.1992) (citations omitted). If defendants are found to be liable for breaches by co-fiduciaries, then co-fiduciary liability is joint and several. *Leister v. Dovetail, Inc.,* 546 F.3d 875, 878 (7th Cir.2008) (citations omitted).

█ Here, the Trachte ESOP trustees had no duty to monitor one another under ERISA § 404(a) because the individual trustees were not "the appointing fiduciary." Trachte had the authority to appoint the trustees, and plaintiffs chose not to sue Trachte. Similarly, while Mastrangelo and Seefeldt ratified the appointment of Alpha as an "independent fiduciary," they did so while acting in their corporate capacities as members of the Trachte board of directors. The trustees acted imprudently by accepting Alpha's direction and by failing to exercise independent judgment, but they did not have discretion to appoint Alpha and thus had no obligation to monitor Alpha under § 404(a). Consequently, the trustees are not directly liable under § 404(a) for any failures to monitor and are not indirectly liable for breaches by one another or by Alpha under § 405(c)(2), for which a § 404(a) violation is a condition.

Moreover, the record does not justify holding the Trachte ESOP trustees indirectly liable for breaches by one another or by Alpha under ERISA § 405(c)(1) and (3). Each of the trustee defendants acted in good faith, albeit naively. Plaintiffs did not establish that any of the Trachte ESOP trustees knew they or Alpha were committing fiduciary breaches. In addition, as the court finds below, plaintiffs have not developed a sufficient record to find that Alpha breached any obligations that it undertook as an "independent fiduciary." Therefore, the court concludes defendants Mastrangelo, Seefeldt and Klute are not liable for any fiduciary breaches by one another or by Alpha.

## B. Alpha Defendants

█ Plaintiffs failed to meet their burden of proof to establish that Alpha and Michael Maier breached any fiduciary obligation with respect to the Trachte ESOP, or that they caused the Trachte ESOP to enter a prohibited transaction.[22] Because Alpha was not appointed as Administrator and the trustees lacked authority to accept a direction from Alpha, Alpha had no discretionary authority under the plan over whether the Trachte ESOP entered the 2007 Transaction. In addition, Alpha did not exercise *de facto* discretionary control over the transaction. Alpha did not become an ERISA fiduciary merely because the trustees chose to treat this letter as a binding direction from Trachte. While Maier believed the trustees would follow his advice, any investment advisor has that expectation, so this fact alone is insufficient to establish that Maier exercised control over the transaction. While there is no *per se* rule preventing professional advisors from becoming ERISA fiduciaries, they are fiduciaries only to the extent they exercise "actual decision-making power rather than the influence that a professional may have over the decisions made by the plan trustees she advises." *Pappas v.*

---

**22.** The court analyzes Alpha and Maier's liability together, because the parties presented no evidence suggesting their actions or potential liabilities were not co-extensive for purpose of this litigation.

*Buck Consultants*, 923 F.2d 531, 535–36 (7th Cir.1991).

Alpha undertook fiduciary responsibilities in its engagement letter. In the letter, Alpha promises "to provide certain financial analysis, consulting and other independent fiduciary services" and "acknowledges and agrees that in providing these services, [Alpha] will be a fiduciary with respect to the ESOP and will be subject to the duties imposed upon a fiduciary by [ERISA]." The precise extent of Alpha's fiduciary duties and the effect of the other contractual restrictions on those duties remain unclear. Alpha might have been a fiduciary as an investment advisor to the Trachte ESOP, because "a person is a fiduciary with respect to a plan to the extent ... he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii). If so, substantial questions remain about the validity of the contractual restrictions that purport to limit Alpha's fiduciary obligations with respect to those financial services. 29 U.S.C. § 1110(a).

However, the court need not reach these questions, because no party raised 29 U.S.C. §§ 1002(21)(A)(ii) or 1110(a) in the course of this litigation. Plaintiffs' Second Amended Complaint alleges only that Alpha breached its fiduciary duties by causing the Trachte ESOP to enter the 2007 Transaction. Throughout, plaintiffs have argued only that Alpha was liable as a "functional fiduciary" for exercising control over the transaction. Plaintiffs have not argued that Alpha owed fiduciary duties as an investment advisor. Nor have they disputed the validity of the limitations on Alpha's fiduciary duties *as an advisor.* Whatever fiduciary duties Alpha had in its role as an investment advisor, Alpha did not breach any fiduciary duties under

§ 404(a)(1) by exercising control over the transaction as alleged by Count VIII of the Second Amended Complaint.

Similarly, because Alpha did not cause the transaction and because plaintiffs have not established that Alpha was acting in a fiduciary capacity, Alpha is not liable for causing a prohibited transaction in violation of § 406(a)(1)(A) or (D) as alleged in Count IX.

In the end, Alpha's and Maier's only arguably negligent act was agreeing to enter into such a poorly written and restrictive engagement letter, but plaintiffs do not point to any ERISA provision leading to liability on this ground alone.

### C. Alliance Holdings, Inc., AHI, AH Transition and Fenkell

#### 1. Fiduciary Status

Alliance was the "Named Fiduciary" of the Alliance ESOP and Fenkell, who also controlled Alliance, was its sole designated trustee with the power to dispose of and manage plan assets. As such, defendants Alliance and Fenkell were both fiduciaries of the Alliance ESOP, including the holdings of its Trachte employee participants. Accordingly, Alliance and Fenkell owed fiduciary duties to the plaintiffs as participants in the Alliance ESOP.

The disputed question on which Fenkell and Alliance plainly hoped to avoid liability from the outset is whether they were acting in their fiduciary capacity when they negotiated and executed the 2007 Transaction. An employer who sponsors an ESOP makes many ordinary business decisions, including the decision to sell the company, that affect the value of its stock and thus the benefits that the ESOP participants will ultimately receive. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). Companies will often also alter the design of their ESOP

in the process of a sale, and such business decisions about whether to sell the company, how to structure the sale or how the new owner will structure the ESOP are not fiduciary decisions. *Ames v. Am. Nat'l*, 170 F.3d 751, 757 (7th Cir.1999). An employer may act in its own interests as an employer when deciding when and how to sell the company. *King v. Nat'l Human Res. Comm., Inc.*, 218 F.3d 719, 723 (7th Cir.2000).

Relying on this general ERISA law, Alliance and Fenkell argue that the Alliance ESOP was involved only in the spin-off, not in any of the remaining steps in the 2007 Transaction. As this court held on summary judgment, as far as the spin-off itself is concerned, the Alliance Defendants complied with the technical requirements of ERISA § 208, because at the moment immediately before and after the spinoff, the plaintiffs' holdings remained in the Alliance ESOP essentially unchanged. According to Fenkell and Alliance, this should end any discussion of their liability under ERISA since they were only acting as fiduciaries during the spin-off and had no fiduciaries duties with respect to any other aspect of the 2007 Transaction, making any decisions made with respect to the plaintiffs' accounts *after* the spin-off the sole responsibility of Trachte, the Trachte ESOP trustees or Alpha.

Certainly, plan design, amendment or termination in the context of a spin-off are settlor functions, not subject to fiduciary duties beyond ERISA § 208. *Id.* (citing *Ames* 170 F.3d at 757; *McNab v. Gen. Motors Corp.*, 162 F.3d 959 (7th Cir.1998)). The purpose of § 208 is, however, to ensure that all benefits accrued under the original plan are funded under the new plan and then to pass to the new trustees the responsibility to protect the interests of participants going forward. *Bigger v. Am. Commercial Lines*, 862 F.2d 1341, 1344 (8th Cir.1988) (concluding Congress intended § 208 to clarify spin-off fiduciary standards). Thus, typically, the fiduciary duties of a trustee would end at the spin-off.

As Fenkell and the other Alliance Defendants well knew, however, the 2007 Transaction was atypical both in its terms and the position of the parties. Fenkell and Alliance (1) arranged the 2007 Transaction so that it would *only* occur on terms favorable to them and disfavorable to a minority interest in the Alliance ESOP; (2) ensured no one on the other side of the transaction would look out for those interests after the spinoff; and (3) ensured that those charged with decision-making authority on the other side of the transaction would remain answerable to Alliance and Fenkell should they not go through with it. In short, it was a classic example of "heads I win, tails you lose."

Like any complex transaction, the 2007 Transaction included a series of smaller transactions or "steps." The completion of one step did not technically obligate the parties to complete the subsequent steps. After the spin-off was executed, the trustees of the new Trachte ESOP were not legally obligated to exchange the shares of Alliance and AH Transition in the participants' accounts for the Trachte shares held by AHI in order to leverage its purchase of Trachte. After the share exchange was executed, the Trachte Board of Trustees was also not legally obligated to take out the loan, to redeem the outstanding Trachte shares, or loan the Trachte ESOP the funds to complete the purchase. Klute, Mastrangelo and Seefeldt had discretionary authority as trustees of the new ESOP to decline to exchange the shares in the Trachte ESOP accounts, to accept the loan from Trachte and to purchase the remaining shares.

Until every step of the 2007 Transaction was executed, however, *none* of the trans-

actions at any step were binding. As originally orchestrated by the Alliance defendants, if one step were not completed, the entire transaction would be unwound: the accounts of the Trachte employees would have merged back into the Alliance ESOP unless the Trachte ESOP proceeded to exchange the shares with AHI *and* Trachte proceeded to obtain the loan *and* the Trachte ESOP purchased the remaining Trachte shares from AHI. The spin-off was *conditioned* on the share exchange and the leveraged buy-out. Either all the steps would occur on terms favorable to Alliance or the transaction would occur not at all. As a result, although the spin-off was the only step that technically required approval by the Alliance ESOP, Fenkell and Alliance *designed* the transaction so that either the accounts of the Trachte participants in the Alliance ESOP would be used as leverage to buy Trachte from Alliance or the accounts would revert to their prior situation with no change.

Were someone on the other side exercising actual, independent discretion in the transaction or negotiations, the structure of this transaction alone might not have been sufficient to conclude that Alliance exercised discretionary control over the transaction. Faced with an obvious conflict of interest, Alliance had several ways to structure the deal to meet their fiduciary obligations to the Trachte employee participants in the Alliance ESOP. As an example, it could have maintained more distance from the choice about how the Trachte ESOP trustees would use the holdings in the plaintiffs' Alliance ESOP accounts after they were spun-off, either

by (a) retaining (or appointing new) independent members for the Trachte Board of Trustees, (b) ensuring the new Trachte ESOP had independent trustees, or (c) appointing an authorized, independent representative for the minority interest in the Alliance ESOP. Alternatively, Alliance could have engaged in a scrupulous investigation to determine whether the transaction was in the best interests of the Trachte employees as participants in the Alliance ESOP. *See Leigh,* 727 F.2d at 125–26.

█ Alliance deliberately chose not to take any of these actions, because it knew an independent decision maker, with paramount interest in Trachte employees' Alliance ESOP accounts, would likely decline (or at least more closely examine and delay) a leveraged sale proceeding at the high end of even arguable value.[23] Instead, Alliance took deliberate steps to ensure that no one would be left to act in the best interests of the Trachte employees once their accounts were spun-off from the Alliance ESOP to the Trachte ESOP, except those with inherent conflicts and subject to Alliance's control unless they approved the deal. While Trachte was the Administrator of the new Trachte ESOP, Alliance remained Trachte's majority shareholder (through AHI). Similarly, Alliance removed any independent members of the Trachte Board of Directors, replacing them with Seefeldt and Mastrangelo, employees of Trachte who were subject to Alliance's control as Trachte's majority shareholder. Finally, Alliance made clear

---

**23.** Alliance also argues that it had an obligation to its shareholders and the AH ESOP to receive the highest price possible for Trachte. The Seventh Circuit has recognized that trustees of an ESOP may have conflicting duties to different classes of participants in the ESOP; such situations may justify greater deference to the good-faith judgments by the fiduciary, but they do not relieve them of their fiduciary duties. *Armstrong v. LaSalle Bank,* 446 F.3d 728, 733–34 (7th Cir.2006) (administrator setting price for share redemption by resigning employees might violate fiduciary duties to resigning employees if price is too low or to remaining employees if price is too high)

its unwillingness to negotiate or to further delay the deal.

As a result of all these actions, Fenkell and Alliance knew the trustees of the new Trachte (1) had a conflict of interest that placed them under substantial duress during the negotiation and assessment of the deal; and (2) lacked the experience and the incentive to assess a deal of this type and complexity. Indeed, Seefeldt had limited understanding of leveraged buy-outs, while Mastrangelo had a limited financial stake and limited knowledge about valuation of closely-held corporations. Both relied heavily on Alliance for advice about how to value and structure the deal. No surprise then that when Alliance proved inflexible as to either, the trustees just went along. Even when the trustees realized their limitations and sought to hire Alpha as an independent advisor, Alliance resisted, ultimately insisting that the trustees limit Alpha's power to review and negotiate the deal.

After failing to find an independent, third party to purchase Trachte at their preferred price, Fenkell and Alliance sought to use the interests of the Trachte employee participants in the Alliance ESOP to obtain a sale on highly favorable terms. Moreover, Fenkell and Alliance arranged the 2007 Transaction so that it would occur as they designed it or not at all, and arranged the players on the other side of the transaction to avoid independent scrutiny of the transaction. The Trachte employees' accounts in the Alliance ESOP were pension funds subject to ERISA, and "it fair to say that someone had a fiduciary obligation to manage the funds appropriately." *King*, 218 F.3d at 724. The fact that a trustee complied with the spin-off requirements of § 208 does not preclude a finding that the trustee exercised further discretionary control over the plan assets. *See John Blair Commc'ns Profit Sharing Plan v. Telem-*undo *Grp.*, 26 F.3d 360, 367–68 (2d Cir. 1994). *Contra Blaw Knox Ret. Income Plan v. White Consol. Indus.*, 998 F.2d 1185, 1190–91 (3d Cir.1993). Alliance exercised discretionary control over the decision to use the accounts of the Trachte employees in the Alliance ESOP as leverage to purchase Trachte from Alliance; therefore, Alliance and Fenkell were acting in their fiduciary capacities for purposes of the 2007 Transaction.

### 2. Fiduciary Breach Under § 404(a) (Count II)

■ As fiduciaries of the Alliance ESOP, Alliance and Fenkell owed a duty of loyalty and a duty of care, which they breached with respect to the Trachte employee participants. Trachte comprised more than fifty percent of Alliance's holdings. Based on internal reports and data produced during the aborted, arms-length sale, Alliance foresaw that the industry was stabilizing and Trachte was unlikely to maintain current levels of growth. Moreover, with Pagelow retiring, Alliance did not trust the remaining members of Trachte management. After a failed attempt to sell Trachte to a third party, Alliance also knew that a third-party buyer would not pay the price they desired. The only way to obtain that price was a leveraged buy-out by management. Trachte management lacked the resources to finance the transaction, so Alliance decided to leverage the assets in the Alliance ESOP accounts of the Trachte employees. Alliance chose to sacrifice the interests of a minority in the Alliance ESOP for its own benefit, thus breaching its fiduciary duty to act solely in the interests of the plan participants.

Despite facing these potential conflicts, Alliance and Fenkell made no effort to assess whether the 2007 Transaction was in the best interests of the Trachte Em-

ployees as participants of the Alliance ESOP. Alliance hired Stout, Risius and Ross to assess the value of Trachte as a holding of Alliance, but never assessed the effect of the leveraged buy-out on the value of Trachte or its shares. Therefore, Alliance and Fenkell breached their duties of loyalty and care that they owed to the Trachte employee participants in the Alliance ESOP.

### 3. Prohibited Transaction by Fenkell (Count IV)

In addition to the duty of loyalty under ERISA § 404(a) and the party-in-interest transactions under ERISA § 406(a), ERISA also creates a per se prohibition against certain forms a self-dealing by fiduciaries. In relevant part, ERISA § 406(b) provides that

> a fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account, ... or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106. The per se prohibitions in § 406 offer "a gloss on the duty of loyalty required by section 404," focusing "primarily on the relationship between the benefit plan and other parties to a transaction, and ... prohibit[ing] transactions where those dealing with the plan may

have conflicting interests which could lead to self-dealing." *Leigh,* 727 F.2d at 123.[24]

The Seventh Circuit has stated that the language of § 406—which it noted was already "quite broad"—should "be read broadly in light of Congress' concern with the welfare of plan participants." *Id.* at 123.[25] Accordingly, the court has interpreted an "interest" to include any interest contrary to the plan, even without a transfer of property, including situations where a fiduciary has a personal stake in a plan investment or has an interest in retaining her job as a corporate officer by complying with a superior's wishes. *Id.* at 127. In such circumstances, a fiduciary's duty of loyalty may be implicated merely by "risking of the trust's assets at least in part to aid the defendants." *Id.* at 122.

As part of the 2007 Transaction, Fenkell received approximately $2.9 million through the Trachte Phantom Stock Plan for Alliance Employees. Thus, Fenkell received consideration in connection with a transaction involving plan assets. The size of this payout depended on the price of the sale. Once it became clear that the price of the third-party sale would not meet their expectations, Fenkell had a substantial interest in arranging a management buy-out financed in significant part by the existing accounts of the Trachte employees in the Alliance ESOP.

Nevertheless, Fenkell argues that he did not engage in a transaction prohibited by § 406(b), because he was not acting as

---

**24.** In this respect, § 406(b) is similar to § 406(a), which the Supreme Court has stated prohibits types of "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length," and that "generally involve uses of plan assets that are potentially harmful to the plan." *Lockheed Corp. v. Spink,* 517 U.S. 882, 893, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) (citations omitted).

**25.** "The nature of the breach of fiduciary duty alleged here is not the loss of plan assets but instead the risking of the trust's assets, at least in part to aid the defendants in their acquisition program. ERISA expressly prohibits the use of assets for purposes other than the best interests of the beneficiaries, and the language of section 1109(a) providing for disgorgement of profits from improper use of trust assets is the appropriate remedy." *Leigh,* 727 F.2d at 122.

a fiduciary *with respect to the transaction that led to his payment.* Under the phantom stock plan as established in 2002, payments would be made upon a change in control of Trachte. Since the spin-off did not result in a change in control, Fenkell argues no assets of the Alliance ESOP were used in the 2007 Transaction, at least not *while Fenkell was acting in his fiduciary role. Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 87 (2d Cir.2001) ("[P]rohibited transaction rules apply only to decisions by an employer acting in its fiduciary capacity."); *see also Lockheed Corp.,* 517 U.S. at 891, 116 S.Ct. 1783 (holding defendant Lockheed was named fiduciary but was not acting as fiduciary with respect to the acts that allegedly violated § 406(a)). Furthermore, he argues, the funds for the payout came from Trachte, and Trachte and the Alliance ESOP were not both party to any step in the 2007 Transaction. Thus, Fenkell concludes, he did not receive consideration from a party dealing with the Alliance ESOP in connection with a transaction involving its assets.

 The court rejects Fenkell's characterizations in a number of respects. First, the assertion that any sale of Trachte would have triggered the payouts is false. According to the phantom stock plan, upon a change in control of Trachte, Trachte had discretion whether to buy-out the phantom stock plan participants or maintain the plan. Trachte was not obligated to make any payouts under the phantom stock plan, and it did not make payments under the phantom stock plan for Trachte employees under identical provisions.

Second, Fenkell unreasonably narrows the roles that he, Alliance and the Alliance ESOP played in the 2007 Transaction, as well as the role of the Alliance ESOP accounts. The holdings in the plaintiffs' Alliance ESOP accounts were integral for the transaction. Trachte management had no other assets to use as collateral. A "management" buyout was only possible if Fenkell controlling Alliance, spun-off plaintiffs' accounts for management to use. Moreover, the spin-off was conditioned on the Trachte ESOP exchanging the shares in plaintiffs' accounts for Trachte shares held by AHI and then using those shares as collateral to purchase AHI's remaining Trachte shares.

Thus, although Fenkell's right to payment was conditioned only on a sale of Trachte, he arranged a sale of Trachte conditioned on using the assets in plaintiffs' Alliance ESOP accounts. Further, not just the fact of Fenkell's payout, but the size of the payout would be determined by the price of Trachte, and that price was substantially higher because Fenkell arranged a leveraged management buyout using Alliance ESOP plan assets rather than a third-party sale. That is precisely why Fenkell arranged to use the Alliance ESOP plan assets. When Fenkell exercised his control to arrange a transaction that would use plan assets to benefit him personally, he entered a prohibited transaction in his role as a fiduciary.

Because Fenkell negotiated the 2007 Transaction so that it was an integrated whole to which he would benefit, either occurring on his terms or not at all, the court will not—as Fenkell obviously hoped from the outset—parse the fiction of individual steps to conclude that he was not "dealing with" plan assets of the Alliance ESOP in the 2007 Transaction or that Trachte was not "a party dealing with" the Alliance ESOP. Fenkell's further argument that the funds for the phantom stock payment came from Trachte, not from the Alliance ESOP, is also irrelevant. Although § 406(a)(1)(D) requires "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan," the source of the funds is irrelevant under § 406(b)(3), which prohibits fiduciaries of

an ERISA plan from receiving "*any* consideration" coming "from *any party* dealing with" the plan in connection with a transaction "involving" plan assets. 29 U.S.C. § 1106.

Therefore, the court concludes that defendant Fenkell violated ERISA § 406(b)(1) by dealing with Alliance ESOP plan assets in his own interest and violated ERISA § 406(b)(3) by receiving consideration from a party dealing with the plan for which he was a fiduciary in connection with a transaction involving plan assets.

### 4. Fiduciary Breach Under § 404(a) for Failure to Monitor Fenkell (Count V) and Co-Fiduciary Liability Under § 405(a)(1)-(3) (Count XIII)

As discussed above, an individual with discretion to appoint an ERISA fiduciary has a fiduciary duty to select, retain and monitor the appointees in accordance with the standards of ERISA § 404(a). *Leigh,* 727 F.2d at 135. In addition, a fiduciary can be liable under ERISA § 405(a) for another fiduciary's breach if he participates knowingly in the breach with knowledge that it is a breach, if his breach of the duty to monitor enables the breach or if he knows about the breach and fails to take "reasonable efforts" to remedy it. 29 U.S.C. § 1105(a). Alliance appointed Fenkell as trustee for the Alliance ESOP, and thus Alliance had a duty to monitor his performance.

▮ Alliance violated its duty to monitor Fenkell's performance as trustee of the

Alliance ESOP. Although Fenkell was the director of the board of trustees and CEO of Alliance, it was Alliance as a corporate entity that appointed Fenkell as sole trustee of the Alliance ESOP. Alliance (albeit through Fenkell's authority) failed to adopt any system for monitoring Fenkell's actions as the trustee of the Alliance ESOP in a fashion reasonably designed to prevent him from breaching his duty of loyalty under § 404(a) or entering prohibited transactions under § 406(b). Therefore, Alliance breached its duty to monitor Fenkell.

Alliance knew that Fenkell would receive payments from the Phantom Stock Plan as part of the 2007 Transaction that also used plan assets of the Alliance ESOP, which constituted a prohibited transaction under § 406(b). Despite this knowledge, Alliance failed to make reasonable efforts to avoid the conflict of interest. In addition, Alliance's failure to monitor Fenkell enabled him to continue participating in the transaction despite his conflicts of interest. Accordingly, Alliance is liable as a co-fiduciary for Fenkell's breach under both ERISA § 405(a)(2) and (3).

### 5. Equitable Relief Under § 502(a)(3)

Counts XIV and XV request equitable relief against the Alliance Defendants under ERISA § 502(a)(3) for breaches of ERISA §§ 404(a) and 406(a) by Alpha and the Trachte ESOP Trustees and for breaches of ERISA §§ 404(a) and 406(a) and (b) by Fenkell and the other Alliance Defendants.[26] Under ERISA § 502(a)(3),

---

**26.** Plaintiffs' have filed a motion for leave to amend their complaint (dkt. # 689) to "clarify" that Count XIV is asserted against all the Alliance Defendants, not simply AHI. Certain paragraphs of Count XIV seek relief against AHI specifically (2d Am. Cpt., dkt. # 254, at ¶¶ 291, 293), but the title of the count is directed "against the Alliance Defendants," which is defined to include Alliance, AHI, AH Transition and Fenkell. (*Id.* at ¶ 22.) The

"entitlement to relief" section of the complaint does not limit plaintiffs' § 502(a)(3) claims to AHI, asserting that "[p]laintiffs are entitled to sue Defendants Alliance, AH Transition, [and] A.H.I., Inc .... pursuant to ERISA § 502(a)(3)." (*Id.* at ¶ 299) Plaintiffs seek to amend ¶ 291 and ¶ 293 to clarify that the relief is sought against all the Alliance defendants. (Bunch Decl., Ex. B, dkt. # 690–2, at 5–6.)

[a] civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

29 U.S.C. § 1132(a)(3). This "catchall" provision provides "a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (underlying violation of § 404(a)). See also *Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 241, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (underlying violation of § 406(a)); *Peabody v. Davis*, 636 F.3d 368, 373 (7th Cir.2011). For example, in *Varity*, the Supreme Court held that reinstatement was appropriate equitable relief for former plan participants when their employer deceived them into withdrawing from the plan, because the other provisions of § 502(a) either would not apply to former participants or did not provide a remedy for individual beneficiaries. *Varity*, 516 U.S. at 515, 116 S.Ct. 1065. Unlike ERISA's substantive fiduciary provisions or co-fiduciary liability in ERISA

§ 405, ERISA § 502(a)(3) authorizes equitable relief against a non-fiduciary for violations of ERISA. *Harris Trust*, 530 U.S. at 246–49, 120 S.Ct. 2180.

While § 502(a)(3) places no limits on the world of defendants, the authorization of "other *appropriate* equitable relief" incorporates limits from the common law of trusts. *Id.* at 250, 120 S.Ct. 2180. The Supreme Court stated in *Harris Trust* that a non-fiduciary must "have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Id.* at 251, 120 S.Ct. 2180; *see also Rest. 2d Trusts* § 297, cmt. a ("A third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee ... is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.")

The Supreme Court suggested that courts determining what a non-fiduciary is expected to know to avoid liability may consider whether their rulings would "require counterparties to transactions with a plan to monitor the plan for compliance

---

Defendants oppose plaintiffs' motion (Defs.' Opp'n, dkt. # 693), arguing that plaintiffs demonstrated their intent to plead Count XIV solely against AHI by choosing to amend certain paragraphs which were directed solely at Alliance so that they were now directed solely at AHI. (*Compare* 1st Am. Compl., dkt. # 79, at ¶¶ 205–206, *with* 2d Am. Compl., dkt. # 254, at ¶¶ 290, 292). Although it is unclear why plaintiffs made these changes, the court and the Alliance Defendants have consistently proceeded as if Count XIV was directed at all the Alliance Defendants. (*See, e.g.,* Alliance's Br. in Supp. of Mtn. S.J., dkt. # 309, 41–42) ("[S]ummary judgment should be granted in favor of the Alliance Defendants on Plaintiffs'

ERISA § 502(a)(3) claim in Count XIV of the Second Amended Complaint.").

Reading the Second Amended Complaint as a whole, and in light of the parties' and the court's consistent understanding, the court concludes that plaintiffs' proposed edits to Count XIV simply clarify that this cause of action is directed against all of the Alliance defendants. As such, plaintiffs' amendment is not strictly necessary, but nevertheless, the court will grant plaintiffs' motion for leave to amend this aspect of the Second Amended Complaint. The court will rule on plaintiff's motion to amend to add Karen Fenkell in a separate order.

with each of ERISA's intricate details." *Id.* at 253, 120 S.Ct. 2180. The Restatement (Second) of Trusts explains that, if a person knows the trustee is transferring trust property, "ordinarily he should make an inquiry as to the terms of the trust in order to ascertain whether and under what circumstances the trustee is empowered to make the transfer." *Rest. 2d Trusts* § 297, cmt. f. It offers the following example:

> if by the terms of the trust the trustee is authorized to sell trust property if, but only if, the beneficiary consents to the sale, a purchaser who has notice of the terms of the trust is bound to inquire whether the beneficiary has consented to the sale, and unless, after using due diligence to ascertain whether the beneficiary has consented, he reasonably believes that such consent has been given, he takes subject to the trust.

*Id.*, cmt. k. However, if the transferee exercises due diligence and concludes reasonably that the transfer does not deviate from the trust terms, then the transferee does not take subject to the trust. *Id.*, cmt. l.

Plaintiffs have not established that equitable relief against the Alliance Defendants for breaches by Alpha or the Trachte ESOP Trustees is appropriate. The court has not found that Alpha breached any fiduciary breaches, and a claim under § 502(a)(3) must be based on some underlying violation of ERISA. *Peacock v. Thomas,* 516 U.S. 349, 353, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996); *Kolbe v. Med. College of Wis., Inc.,* 657 F.3d 496, 504 (7th Cir.2011).

■ Although the Trachte trustees violated § 404(a)(1)(D) and § 406(a), equitable relief is not appropriate for these violations. The Alliance Defendants should not be expected to know whether Alpha was appointed properly, whether the trustees had a right to follow its direction or whether the trustees exercised sufficient independent judgment in following Alpha's advice. A contrary ruling would be tantamount to requiring Alliance to scour the terms of the Trachte ESOP and monitor its trustees to ensure they comply with its technical appointment provisions. The plan administrators and trustees bear primary responsibility for acting within the scope of their authority under the plan. A reasonable third party looking at the Trachte ESOP may have concluded that Alpha was appointed properly with authority to direct the trustees.

For similar reasons, the court concludes it is not appropriate to hold the Alliance Defendants responsible for the violation of § 406(a) by the Trachte ESOP trustees. Alliance was aware that the trustees had hired Barnes Wendling for a fairness opinion and that Alpha provided additional advice. Imposing liability in these circumstances would require a party to watch over the shoulder of their counterparts to insure that they perform adequate investigation and to be a guarantor that the transaction precedes for fair market value. Requiring this type of interference would hinder the ability of ESOPs to enter armslength transactions and invite more of the type of interference that caused the difficulties in this transaction.

With respect to Alliance and Fenkell, equitable relief under § 502(a)(3) is unnecessary in light of the finding that they were liable as co-fiduciaries under § 405. In contrast, neither AHI nor AH Transition were fiduciaries of the Trachte ESOP or the Alliance ESOP. Section 502(a)(3) is plaintiffs' only possible basis for relief against AHI and AH Transition for Alliance and Fenkell's ERISA fiduciary violations of § 404(a) and § 406(b).

AHI and AH Transition *were* participants in a crucial part of the 2007 Transaction: the share exchange. AH Transition

is a wholly-owned subsidiary of the Alliance ESOP. AH Transition held approximately 47% of the shares of Alliance. AHI is a wholly-owned subsidiary of Alliance. Several months prior to the 2007 Transaction, Alliance transferred its shares in Trachte to AHI. Between that time and the 2007 Transaction, AHI held no other assets. As part of the 2007 Transaction, AHI transferred all of its Trachte shares to the Trachte ESOP in exchange for a promissory note. AHI assigned 92.87%, or $7.25 million, of the promissory note to AH Transition and the remainder to Alliance, and received no consideration in return. The Trachte ESOP repaid the note by transferring to Alliance and AH Transition all the shares of Alliance and AH Transition that were previously in plaintiffs' accounts with the Alliance ESOP.

■ Alliance, AHI and AH Transition were commonly controlled. Fenkell was the sole board member and president of Alliance, AHI and AH Transition. The same individuals are officers for Alliance Holdings, AHI and AH Transition. Neither AHI nor AH Transition have any other employees. Prior to and during the 2007 Transaction, assets were transferred between Alliance and AHI and between the Alliance ESOP and AH Transition without concern for their status as distinct corporate entities. Alliance has set up AHI and AH Transition for two purposes: to enable Alliance to avoid entering transactions as a fiduciary for the Alliance ESOP or as a party in interest and to permit Alliance to acquire corporate entities with different tax statuses. Accordingly, the court concludes that AHI and AH Transition knowingly participated in the 2007 Transaction with actual knowledge of the circumstances surrounding the breaches by Alliance and Fenkell. Therefore, equitable relief against AHI and AH Transition is appropriate. *See Papa v. Katy Ind., Inc.,* 166 F.3d 937, 941 (7th Cir.1999) ("The privilege of separate incorporation is not intended to allow enterprises to duck their statutory duties.").

## ORDER

Consistent with the above, the court finds and holds that:

1. Plaintiffs' motion to strike portions of Robert Gross's Expert Testimony (dkt. # 472) is DENIED;

2. plaintiffs' motion for leave to amend their complaint (dkt. # 689) is GRANTED IN PART and RESERVED IN PART as follows

 a. plaintiffs' motion to amend Count XIV to clarify that the count is directed to all the Alliance Defendants is GRANTED, and

 b. plaintiffs' motion to amend to add Karen Fenkell as a defendant and to add a new cause of action against her is RESERVED;

3. plaintiffs may proceed to the damages phase of the trial against defendants Alliance Holdings, Inc., A.H.I., Inc., AH Transitions, Corp., David Fenkell, James Mastrangelo, Jeffrey Seefeldt and Pamela Klute and nominal defendants Trachte Building Systems, Inc. Employee Stock Ownership Plan and Alliance Holdings, Inc. Employee Stock Ownership Plan; and

4. all claims against defendant Alpha Investment Consulting Group, LLC and Michael Maier are DISMISSED with prejudice.